1   JOHN W. SPIEGEL (SBN: 78935)
    John.Spiegel@mto.com
2   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, Thirty-Fifth Floor
3   Los Angeles, CA  90071-1560
    Telephone:  (213) 683-9100
4   Facsimile:   (213) 687-3702

5   JONATHAN H. BLAVIN (SBN: 230269)
    Jonathan.Blavin@mto.com
6   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, 27th Floor
7   San Francisco, CA  94105
    Telephone:  (415) 512-4000
8   Facsimile:   (415) 512-4077

9
    Attorneys for Plaintiff
10  EMECO INDUSTRIES, INC.

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14  EMECO INDUSTRIES, INC.              CASE NO.  CV 12-05072 MMC

15          Plaintiff,                  **PLAINTIFF'S NOTICE OF MOTION
                                        AND MOTION FOR PRELIMINARY
16      v.                              INJUNCTION; MEMORANDUM OF
                                        POINTS AND AUTHORITIES IN
17                                      SUPPORT THEREOF**
    RESTORATION HARDWARE, INC., GARY
18  FRIEDMAN, and DOES 1-10.            Date:        November 16, 2012
            Defendants.                 Time:        9:00 a.m.
19                                      Courtroom:   7
                                        Judge:       Honorable Maxine M. Chesney
20

21

22

23

24

25

26

27

28

1  **NOTICE OF MOTION AND MOTION**

2  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3  PLEASE TAKE NOTICE that on November 16, 2012, at 9:00 a.m. or as soon thereafter

4  as counsel may be heard in Courtroom 7 of the above-captioned Court, located at 450 Golden

5  Gate Avenue, San Francisco, CA 94102, Plaintiff Emeco Industries, Inc. ("Emeco" or "Plaintiff")

6  will and hereby does move for a preliminary injunction restraining and enjoining Defendants

7  Restoration Hardware, Inc., its former Chief Executive Officer and present Chairman Emeritus,

8  Creator and Curator Gary Friedman, and Does 1-10 (collectively, "Restoration Hardware" or

9  "Defendants"), from violating Emeco's exclusive rights under the Lanham Act, 15 U.S.C. § 1051

10  *et seq.*

11  Good cause exists for the requested Preliminary Injunction Order.  As demonstrated in

12  detail in the accompanying Memorandum of Points and Authorities and supporting papers,

13  Restoration Hardware has violated, is violating and unless restrained will continue to violate 15

14  U.S.C. §§ 1114(1), 1125(a) by manufacturing, marketing, advertising, and selling its "Naval

15  Chair" line of products.  Unless restrained, Restoration Hardware will continue to cause

16  immediate and irreparable harm to Emeco.  The balance of hardships on this motion weighs

17  decisively in Emeco's favor.  And the requested injunction will further the public interest.

18  This Motion is based on this Notice of Motion and Motion; the attached Memorandum of

19  Points and Authorities; the contemporaneously-filed Declarations of Gregg Buchbinder and

20  Jonathan H. Blavin; the pleadings on file in this action; and such other and further materials or

21  argument as may be presented to the Court at or before the hearing on this Motion.

22  DATED: October 10, 2012                    MUNGER, TOLLES & OLSON LLP

23

24

25  By:_____ */s/ John W. Spiegel*_____
                              JOHN W. SPIEGEL

26  Attorneys for Plaintiff Emeco Industries, Inc.

27

28

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO.  CV 12-05072 MMC

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND .........................................................................................................3

       A.     Emeco and Its Iconic Navy Chair® Collection ........................................3

       B.     Emeco's Navy Chair® Trade Dress and Trademark Rights.....................5

       C.     Restoration Hardware Has Replicated The Navy Chair® Collection ....................6

       D.     Restoration Hardware's Infringing Conduct Is Willful and Part of an
              Established Business Practice..................................................................10

       E.     Emeco's Pre- and Post-Lawsuit Communications with Restoration
              Hardware.................................................................................................10

III.   STANDARD..............................................................................................................11

IV.    EMECO IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE DRESS
       AND TRADEMARK INFRINGEMENT CLAIMS .........................................12

       A.     The Navy Chair® Trade Dress and Trademarks Are Entitled to a "Strong
              Presumption" of Validity Which Restoration Hardware Cannot Overcome.........12

              1.     The Navy Chair® Design Is Protectable Trade Dress...............................13

              2.     The Navy Chair® Mark Is a Protectable Trademark..............................18

       B.     There Exists a Likelihood of Consumer Confusion with Respect to Both
              the Navy Chair® Trade Dress and Trademark ........................................19

V.     EMECO WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION .......21

VI.    THE BALANCE OF HARDSHIPS SHARPLY TIPS IN EMECO'S FAVOR...............23

VII.   AN INJUNCTION FURTHERS THE PUBLIC INTEREST ...........................................24

VIII.  CONCLUSION..........................................................................................................24

1

**TABLE OF AUTHORITIES**

2

Page

3   FEDERAL CASES

4   *adidas-America, Inc. v. Payless Shoesource, Inc.*,
        546 F. Supp. 2d 1029 (D. Or. 2008) .................................................................................... 16
5
    *Alliance for the Wild Rockies v. Cottrell*,
6       632 F.3d 1127 (9th Cir. 2011) ............................................................................................ 11

7   *Alphaville Design, Inc. v. Knoll, Inc.*,
        627 F. Supp. 2d 1121 (N.D. Cal. 2009) .............................................................................. 14
8
    *AmBrit, Inc. v. Kraft, Inc.*,
9       812 F.2d 1531 (11th Cir. 1986) ........................................................................................... 17

10  *Apple, Inc. v. Samsung Elecs. Co.*,
        2012 WL 2571719 (N.D. Cal. June 30, 2012) ............................................................... 15, 16
11
    *Au-Tomotive Gold, Inc. v. Volkswagen of Am, Inc.*,
12      457 F.3d 1062 (9th Cir. 2006) ............................................................................................ 20

13  *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*,
        283 F.2d 551 (9th Cir. 1960) .............................................................................................. 17
14
    *Bambu Sales, Inc. v. Ozak Trading Inc.*,
15      58 F.3d 849 (2d Cir. 1995) ................................................................................................. 21

16  *Beats Electronics, LLC v. Fanny Wang Headphone Co.*,
        2011 WL 31198 (N.D. Cal. Jan. 5, 2011) ........................................................................... 15
17
    *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,
18      174 F.3d 1036 (9th Cir. 1999) ................................................................................. 19, 20, 21

19  *CJ Prods. LLC v. Snuggly Plushez LLC*,
        809 F. Supp. 2d 127 (E.D.N.Y. 2011) ................................................................................ 23
20
    *Clicks Billiards, Inc. v. Sixshooters, Inc.*,
21      251 F.3d 1252 (9th Cir. 2001) ................................................................................. 12, 13, 14, 15

22  *Cosmos Jewelry Ltd. v. Po Sun Hon Co.*,
        470 F. Supp. 2d 1072 (C.D. Cal. 2006) ......................................................................... 13, 14
23
    *Cosmos Jewelry Ltd. v. Po Sun Hon, Co.*,
24      2004 WL 1515943 (C.D. Cal. Apr. 5, 2004) .................................................................. 17, 18

25  *Creative Labs, Inc. v. Cyrix Corp.*,
        141 F.3d 1174, 1998 WL 141183 (9th Cir. 1998) .............................................................. 24
26
    *Creative Tech., Ltd. v. SRT, Inc.*,
27      1993 WL 603292 (N.D. Cal. Nov. 8, 1993) ....................................................................... 17

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Diller v. Barry Driller, Inc.*,
    2012 WL 4044732 (C.D. Cal. Sept. 10, 2012) ........................................................23

4

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
5    158 F.3d 1002 (9th Cir. 1998) .............................................................14

6

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) .........................................................16, 18

7

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
8    741 F. Supp. 2d 1165 (C.D. Cal. 2010) ....................................15, 16, 18

9

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
    198 F.3d 1143 (9th Cir. 1999) ...............................................................17

10

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
11    314 F.2d 149 (9th Cir. 1963) .................................................................17

12

*Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*,
    453 F.3d 351 (6th Cir. 2006) .................................................................20

13

*Givenchy S.A. v. BCBG Max Azria Group, Inc.*,
14    2012 WL 3072327 (C.D. Cal. Apr. 25, 2012) .......................................18

15

*GTFM, Inc. v. Solid Clothing, Inc.*,
    215 F. Supp. 2d 273 (S.D.N.Y. 2002) ...................................................21

16

*Herman Miller Inc. v. Alphaville Design Inc.*,
17    2009 WL 3429739 (N.D. Cal. Oct. 22, 2009) ..................................19, 21

18

*Imagineering, Inc. v. Van Klassens, Inc.*,
    53 F.3d 1260 (Fed Cir. 1995) ................................................................18

19

*In re Browning*,
20    217 U.S.P.Q. 933 (T.T.A.B. 1982) ........................................................16

21

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
    559 F.3d 985 (9th Cir. 2009) .................................................................24

22

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*,
23    2007 WL 328696 (N.D. Cal. Feb. 2, 2007) ...........................................19

24

*Levi Strauss & Co. v. Shilon*,
    121 F.3d 1309 (9th Cir. 1997) .......................................................1, 2, 22, 23

25

*Metro Kane Imports, Ltd. v. Rowoco, Inc.*,
26    618 F. Supp. 273 (S.D.N.Y 1985) .........................................................14

27

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ...............................................................12

28

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO.  CV 12-05072 MMC

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
         290 F.3d 578 (3d Cir. 2002) ........................................................................................24

4

     *Paulsson Geophysical Servs., Inc. v. Sigmar*,
5        529 F.3d 303 (5th Cir. 2008) .......................................................................................22

6    *PetMed Express, Inc. v. MedPets.Com, Inc.*,
         336 F. Supp. 2d 1213 (S.D. Fla. 2004) .......................................................................23

7

     *Philip Morris USA Inc. v. Felizardo*,
8        2004 WL 1375277 (S.D.N.Y. June 18, 2004) ............................................................19

9    *Phillip Morris USA Inc. v. Shalabi*,
         352 F. Supp. 2d 1067 (C.D. Cal. 2004) ......................................................................19

10

     *Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
11       793 F.2d 1132 (9th Cir. 1986) ...............................................................................22, 24

12   *Publ'ns Int'l, Ltd. v. Landoll, Inc.*,
         164 F.3d 337 (7th Cir. 1998) .......................................................................................12

13

     *QVC, Inc. v. Your Vitamins, Inc.*,
14       714 F. Supp. 2d 291 (D. Del. 2010) ............................................................................20

15   *Rebel Debutante LLC v. Forsythe Cosmetic Group, Ltd.*,
         799 F. Supp. 2d 558 (M.D.N.C. 2011) .......................................................................23

16

     *Reno Air Racing Ass'n, Inc. v. McCord*,
17       452 F.3d 1126 (9th Cir. 2006) ...............................................................................13, 18

18   *Rolex Watch U.S.A., Inc. v. Zeotec Diamonds, Inc.*,
         2003 WL 23705746 (C.D. Cal. Mar. 7, 2003) ...........................................................22

19

     *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
20       240 F.3d 832 (9th Cir. 2001) .......................................................................................21

21   *Summit Entm't, LLC v. Beckett Media, LLC*,
         2010 WL 147958 (C.D. Cal. Jan. 12, 2010) ...............................................................23

22

     *SunEarth, Inc. v. Sun Earth Solar Power Co.*,
23       846 F. Supp. 2d 1063 (N.D. Cal. 2012) ......................................................................21

24   *Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*,
         2007 WL 535041 (W.D. Ark. Feb. 16, 2007)..............................................................22

25

     *U.S. Jaycees v. S.F. Jr. Chamber of Commerce*,
26       354 F. Supp. 61 (N.D. Cal. 1972) ...............................................................................17

27   *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
         2012 WL 2343670 (N.D. Cal. June 20, 2012) ............................................................19

28

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO.  CV 12-05072 MMC

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*United Parcel Serv., Inc. v. Package Am., Inc.*,
1996 WL 376610 (N.D. Cal. May 9, 1996).....................................................................20

4

*United States v. Guerra*,
5
293 F.3d 1279 (11th Cir. 2002) ......................................................................................19

6

*United States v. Lam*,
677 F.3d 190 (4th Cir. 2012) ..........................................................................................19

7

*Vision Sports, Inc. v. Melville Corp.*,
8
888 F.2d 609 (9th Cir. 1989) ..........................................................................................17

9

*Volkswagen AG v. Verdier Microbus and Camper, Inc.*,
2009 WL 928130 (N.D. Cal. Apr. 3, 2009).....................................................................20

10

*Vuitton Et Fils S.A. v. J. Young Enters., Inc.*,
11
644 F.2d 769 (9th Cir. 1981) ..........................................................................................12

12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000)..........................................................................................................16

13

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
14
549 F. Supp. 2d 1168 (N.D. Cal. 2007) .........................................................................15

15

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)......................................................................................................2, 11

16

*WWP, Inc. v. Wounded Warriors, Inc.*,
17
566 F. Supp. 2d 970 (D. Neb. 2008)...............................................................................19

18

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
602 F.3d 1108 (9th Cir. 2010) ........................................................................................12

19

**STATUTES AND RULES**

20

15 U.S.C. § 1057(b).............................................................................................................12

21

15 U.S.C. § 1115(a) ............................................................................................................13

22

15 U.S.C. § 1115(b).............................................................................................................13

23

Fed. R. Civ. P. 65(c) ..........................................................................................................24

24

**OTHER AUTHORITIES**

25

1 McCarthy on Trademarks and Unfair Competition § 7:70 (4th ed. 1998) .................14

26

1 McCarthy on Trademarks and Unfair Competition § 7:74 (4th ed. 1998) .................16

27

28

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO.  CV 12-05072 MMC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Restoration Hardware is blatantly infringing Emeco's trade dress and trademark rights in its world-renowned Navy Chair® products.  Beginning in September 2012, Restoration Hardware began selling a series of cheap knockoffs, with the near-identical "Naval Chair" name, that copy verbatim the iconic and distinctive design of Emeco's Navy Chair® collection.  Below is a side-by-side comparison of Emeco's Navy Chair® and Restoration Hardware's "Naval Chair."

 **Emeco's Navy Chair®**           **Restoration Hardware's "Naval Chair"**

          

Declaration of Jonathan H. Blavin ("Blavin Decl.") ¶¶ 2-3, Exs. 1-2.

Effectively conceding a likelihood of consumer confusion, Restoration Hardware removed the words "Naval Chair" from its website, and then apparently ceased sales of the products, though only after Emeco filed this lawsuit, only after ignoring repeated cease-and-desist letters from Emeco, and only after distributing millions of catalogs featuring the infringing products.  Notwithstanding these measures, this Court can and should issue an injunction.  Restoration Hardware still continues to display the infringing products on its website, and there is nothing to stop Restoration Hardware from resuming its unlawful conduct at any moment.  As the Ninth Circuit has held, a "trademark plaintiff is 'entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in [the plaintiff's] favor as the innocent producer and against the [defendant], which has shown by its conduct that it is not to be trusted.' [The plaintiff] is not required to produce evidence that [the defendant] is likely to infringe again." *Levi Strauss & Co.*

1    *v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997).

2         Originally commissioned by the United States Navy during World War II, the Emeco

3    Navy Chair® is a modern icon of twentieth-century design, universally celebrated for its

4    craftsmanship and sustainable composition.  The Navy Chair® is featured in the permanent

5    collections of several modern art museums and is a prominent fixture of offices, homes, hotels,

6    and restaurants around the world.  Emeco is widely known as the source of the Navy Chair®,

7    which is sculpted and manufactured by hand in Hanover, Pennsylvania through a highly technical

8    and precise process comprising 77 steps.  By contrast, Restoration Hardware's "Naval Chairs" are

9    made overseas for a fraction of the cost and are not the result of the rigorous manufacturing

10   process that ensures the high quality of the Navy Chair® product line.  They are sold at retail at

11   prices that are on average $300 less than their Navy Chair® counterparts.

12        Emeco's likely success on the merits is clear.  The validity of the Navy Chair® trade dress

13   and trademark is beyond doubt.  Emeco has federal registered marks in the design of the Navy

14   Chair® and in the Navy Chair® trademark, which have obtained incontestable status, providing

15   conclusive proof of secondary meaning.  As counterfeit products, Restoration Hardware's "Naval

16   Chairs" are inherently confusing, and in fact, consumers already have demonstrated confusion as

17   to whether the products are genuine Emeco articles or are otherwise affiliated with Emeco.

18        Restoration Hardware's willful and manifest infringement has caused and will continue to

19   cause irreparable harm to Emeco's reputation and significant goodwill absent an injunction.

20   Unlike a typical, smalltime counterfeiter, Restoration Hardware is an established company, with a

21   billion dollars in annual sales and nearly a hundred stores.  Not only are direct purchasers likely

22   to believe that the products it sells are genuine, legitimate articles, not cheap counterfeits made

23   overseas, but there is a high likelihood of "post-purchase" confusion by consumers who see the

24   inferior "Naval Chairs" in the world and confuse them with the Emeco originals.

25        The remaining factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

26   7 (2008) (balance of hardships and public interest), also weigh decisively in Emeco's favor.

27   Restoration Hardware's conduct would be outrageous for a small, unsophisticated company,

28   much less for an established company like it.  The Court should enjoin its illegal activities.

1

## II.     BACKGROUND

2

### A.     Emeco and Its Iconic Navy Chair® Collection

3      Emeco was founded in 1944 in Hanover, Pennsylvania.  Declaration of Gregg Buchbinder

4 ¶ 4 ("Buchbinder Decl.").  Commissioned by the United States Navy during World War II to

5 build a seaworthy, lightweight and durable chair suitable for use on warships and submarines,

6 Emeco developed the iconic Navy Chair® (known as the "1006 Navy Chair®").  *Id*.  The United

7 States government to this day is a purchaser of Emeco Navy Chairs®.  *Id*.

8      In the years since, the Emeco Navy Chair® has been recognized as a modern masterpiece

9 of twentieth-century design.  It is in the permanent collections of museums around the world,

10 including the Design Museum in London and the Carnegie Museum of Art in Pittsburgh, and is

11 presently on display in the Museum of American History in Washington, D.C. and in a traveling

12 exhibition entitled *The Art of Seating: 200 Years of American Design*.  *Id*. ¶ 5.  It is used in

13 homes, offices, hotels, colleges, and restaurants around the world and regularly appears in design

14 magazines and books, fashion layouts, and Hollywood films and television series.  *Id*.  Exemplars

15 of articles from magazines, newspapers, and websites, and chapters from design books discussing

16 Emeco and the Navy Chair® are submitted with this Motion.  *See* Blavin Decl. ¶ 4, Exs. 3.1-3.9.[1]

17 The Navy Chair® also has been prominently displayed by preeminent designers — including

18 Philippe Starck and Frank Gehry — in their own projects, and such designers also have

19 collaborated with Emeco in their own furniture designs.  Buchbinder Decl. ¶ 5.

20      The Navy Chair® is constructed by hand in Hanover, one at a time, through a highly

21 technical and precise manufacturing process consisting of 77 steps.  *Id*. ¶ 6.  The aluminum chairs

22 are subjected to a thermal treatment, making them three times stronger than steel.  *Id*.  Emeco has

23 approximately 54 workers in Hanover that produce an output of about 1,000 Navy Chairs® per

24 month.  *Id*.  Each chair is expected to last for 150 years, and comes with a lifetime guarantee.  *Id*.

25 Emeco Navy Chairs® also pass the most stringent American National Standards Institute (ANSI)

26 and Business and Institutional Furniture Manufacturer's Association (BIFMA) standards.  *Id*. ¶ 7.

27

28

---

[1] The outline of the Navy Chair® was even recently featured in a *New York Times* Design and
Architecture crossword puzzle.  *See* Blavin Decl. ¶ 5, Ex. 4.

Emeco has an industry-wide reputation for exclusively manufacturing the Navy Chair®
through this rigorous process, and is widely known as the source of the Navy Chair®. *Id*. The
unique Emeco manufacturing process and the Navy Chair® product line have been featured by
several media outlets, including CNN, HGTV's "Design DNA" show, and John Ratzenberger's
"Made in America" show. Copies of these videos are submitted herewith. *See* Blavin Decl. ¶ 6,
Ex. 5. Emeco has extensively advertised and marketed the Navy Chair® and has sold over
1,000,000 of them, associating Emeco as their source. Buchbinder Decl. ¶ 8.

As part of a Joint Venture Partnership with the Coca-Cola company, Emeco also
constructs an identical version of the Navy Chair® made out of recycled plastic Coca-Cola
bottles (known as the "111 Navy Chair®"). *Id.* ¶ 9. The production of this chair is expected to
keep three million plastic bottles out of landfills each year (since 2010, 8 million bottles have
been keep out of landfills). *Id*. The 111 Navy Chair® is available in various colors, including
black, red, green, orange, and white. *Id*. The 111 Navy Chair® has won several awards,
including the Good Design Award and the International Forum Product Design Award. *Id*.

Below are images of the 1006 Navy Chair® and the 111 Navy Chair®.

**1006 Navy Chair®**                    **111 Navy Chair®**



*Id*. ¶ 9; Blavin Decl. ¶ 2, Ex. 1. In addition, Emeco makes a number of other products as part of
its Navy Chair® collection, including the Navy Armchair, the Navy Counter Stool, and the Navy
Barstool.

**The Navy Armchair**     **The Navy Counter Stool**     **The Navy Barstool**

          

Buchbinder Decl. ¶ 10; Blavin Decl. ¶ 2, Ex. 1.  Emeco sells its Navy Chair® collection directly

to consumers, including through its website, and through established retail furniture and design

stores such as Design Within Reach.  Buchbinder Decl. ¶ 13.  Emeco also sells the products to

trade architects and designers, governments, contract dealers, international distributors, and for

end use commercial applications.  *Id.*

### B.    Emeco's Navy Chair® Trade Dress and Trademark Rights

Emeco is the owner of the exclusive trade dress and trademark rights in the Navy Chair®.

Emeco is the owner of U.S. federal registration nos. 2,511,360 and 3,191,187, which

cover the design and outline of the Navy Chair®, respectively.  Blavin Decl. ¶¶ 7-8 , Exs. 6-7.

Under these registrations, Emeco has the exclusive right to use the design and outline of the Navy

Chair® in connection with its furniture and marketing.  *Id.*  Both of these trademarks are

incontestable.  *Id.*  Emeco is also the owner of U.S. federal registration nos. 3,016,791 and

3,912,854, which cover the trademarks "Navy Chair" and "111 Navy Chair."  *Id.* ¶¶ 9-10, Exs. 8-

9.  Under these registrations, Emeco has the exclusive right to use the Navy Chair® trademark.

The "Navy Chair" trademark is incontestable.  *Id.* ¶ 9, Ex. 8.

Emeco's use of the Navy Chair® design and trademark has been substantially continuous

and exclusive.  Since the 1970s, Emeco has exclusively used the Navy Chair® design, and since

1999, has exclusively used the Navy Chair® trademark.  Buchbinder Decl. ¶ 14.  Pictures of

Emeco's signature chair have been used for over 60 years to portray the company.  *Id.*  Emeco

distributes approximately 10,000 product brochures and 1,500 complete catalogues each year featuring the Navy Chair®, and the Navy Chair® has been prominently featured on the front of such brochures and on Emeco's website. *Id.* ¶ 15, Exs. A-B. Emeco also displays and advertises the Navy Chair® in well-known publications, including *Interior Design Magazine*, *Dwell Magazine*, and *The New York Times*, and through social media sites like Twitter, Facebook, and Tumblr. *Id.* Emeco has spent $1.8 million over the last 4 years marketing, advertising, and promoting its products in connection with the Navy Chair® design and trademark. *Id.* Emeco's marketing budget is roughly 10% of total sales every year. *Id.*

Emeco considers its Navy Chair® trade dress and trademark rights to be invaluable assets essential to its success. The Navy Chair® is its signature product, and has come to symbolize the company itself. *Id.* ¶ 16. Emeco believes the design of the chair to be so closely associated with it that it uses an outline of the chair (registration no. 3,191,187) as its official logo. *Id.*, Ex. A-B. This logo is prominently displayed on Emeco's website, its brochure and other promotional materials, and is affixed to the packaging of every Emeco product, regardless of style. *Id.*



*Id.* Emeco has taken aggressive action against infringers of its trademark and trade dress rights in the Navy Chair®, including obtaining a consent judgment finding Emeco's rights in the Navy Chair® to be valid and enforceable and a permanent injunction barring a counterfeiter from infringing Emeco's rights. Buchbinder Decl. ¶¶ 21-23 & Ex. C.

**C.     Restoration Hardware Has Replicated The Navy Chair® Collection**

Beginning in September 2012, Restoration Hardware began to sell its "Naval Chair" product line. Without any authorization from Emeco, Restoration Hardware has replicated the distinctive trade dress of Emeco's Navy Chair® collection with a series of cheap knockoffs, and has used the confusingly similar "Naval Chair" mark in describing these products.

1    The designs of the Restoration Hardware "Naval Chair" products are virtually identical to

2  the Emeco Navy Chair® collection, as shown below.

**Navy Chair®**                          **"Naval" Side Chair**

                    

**Navy Armchair**                       **"Naval" Armchair**

                    

**Navy Counter Stool**                  **"Naval" Counter Stool**

                    

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO.  CV 12-05072 MMC

1

**Navy Barstool**                                        **"Naval" Barstool**

2

3

4                                                

5

6

7

8

9   Buchbinder Decl. ¶¶ 9-10; Blavin Decl. ¶¶ 2-3, Exs. 1-2.  The "Naval Chair" products sell at

10  retail prices that are on average $300 less than their Navy Chair® counterparts, and come in

11  aluminum, black, and white, like the 1006 and 111 Navy Chair® models.  Blavin Decl. ¶¶ 2-3,

12  Exs. 1 -2.  The Restoration Hardware "Naval Chair" products are believed to be manufactured

13  overseas, and are not the result of the extensive and precise manufacturing process that ensures

14  the high quality of the Navy Chair® line.[2]

15          Restoration Hardware has prominently marketed and advertised its chairs and stools with

16  the "Naval Chair" name in its print catalog and on its website.  Below is an image from the

17  Restoration Hardware fall 2012 catalog.  *Id.* ¶ 12, Ex. 11.  For the last fiscal year, Restoration

18  Hardware distributed approximately 26.1 million catalogs to consumers.  *Id.* ¶ 13, Ex. 12.

19

20

21

22                              

23

24

25

26

27  [2] As Restoration Hardware has stated in its pre-IPO filings with the Securities and Exchange
    Commission, approximately 77% of its products are sourced in Asia, the majority of which
28  originate from China.  Blavin Decl. ¶ 11, Ex. 10 at 25.

Below is an image of the Restoration Hardware website using the "Naval Chair" name.



*Id.* ¶ 14, Ex. 13.  In 2011, Restoration Hardware's websites logged over 14.3 million unique visits.  *Id.* ¶ 11, Ex. 10 at 43.

Although the "Naval Chairs" have only been on the market for a short time, instances of actual consumer confusion already are apparent.  Consumers have made statements expressing belief that the "Naval" chairs are genuine Emeco articles, or have otherwise improperly associated them with the Emeco brand.  For example, when commentators on the well-known interior design website Apartment Therapy discussed the possibility of purchasing Navy Chair® counterfeits in the comments section of an article entitled "Good Questions: *Substitution for Emeco Chairs?*", one commentator stated:



*Id.* ¶ 15, Ex. 14 at 9.  Similarly, in the comments section of another article on Apartment Therapy entitled "Design Classic: *Emeco Chairs,*" a commentator stated:



*Id.* ¶ 16, Ex. 15 at 2.  Likewise, on the popular social sharing photo website Pinterest, one user

posted a photo of the Restoration Hardware "Naval Chair" with the following description:

Emeco-esque Chair: $129 Restoration Hardware - Aluminum Standard Side Chair

*Id.* ¶ 17, Ex. 16.

### D. Restoration Hardware's Infringing Conduct Is Willful and Part of an Established Business Practice

The near-identical nature of the Navy Chair® and "Naval Chair" product lines is not mere coincidence, but is the result of willful, intentional conduct that is part of Restoration Hardware's established practice of using others' designs and trademarks for financial gain. As Restoration Hardware itself has stated, euphemistically, in its pre-IPO filings with the Securities and Exchange Commission, "[a]t our core we are not designers, rather we are curators and composers of inspired design and experiences." Blavin Decl. ¶ 11, Ex. 10 at 66. Restoration Hardware acknowledges in these filings that by "[e]xternally discover[ing] and curat[ing]" *others'* designs, as opposed to "[i]nternally design[ing] and develop[ing]" its own products, it can cut the development process from "12-18 months lead time" to "3-9 months" and "reduce product costs." *Id.*, Ex. 10 at 70 and 66. By contrast, it takes Emeco two to four years to design, prototype, R&D, engineer, market, and launch a new, original product, and there is no guarantee that it will sell. Buchbinder Decl. ¶ 20. Indeed, Restoration Hardware has been the focus of half a dozen copying and infringement actions over the last decade, with one observer stating, "[t]hey should call it Replication Hardware." Blavin Decl. ¶¶ 18-19, Ex. 17 at 2.

### E. Emeco's Pre- and Post-Lawsuit Communications with Restoration Hardware

On September 7, 2012, Gregg Buchbinder, President & CEO of Emeco, had a telephone conversation with Glenn Krevlin, a member of the board of directors of Restoration Hardware, in which he expressed his concerns regarding the "Naval Chair" product line and told him that if Restoration Hardware did not cease its conduct, Emeco would be forced to bring legal action. Buchbinder Decl. ¶ 24. Mr. Krevlin responded that Mr. Buchbinder should email him a summary of Emeco's demands so that he could forward them to key personnel at Restoration Hardware. *Id.* Per this suggestion, Mr. Buchbinder sent an email to Mr. Krevlin the next day, summarizing

1    Emeco's position and demands, and requesting that he bring this issue to the attention of

2    Restoration Hardware.  *Id.* ¶ 25, Ex. D.  Mr. Krevlin stated in response, "Got it."  *Id.*

3         Seeing no response from Restoration Hardware, on September 20, 2012, Emeco's counsel

4    sent a letter to Restoration Hardware's current CEO, Carlos Alberini, again requesting that

5    Restoration Hardware cease and desist its infringing conduct.  Blavin Decl. ¶ 20, Ex. 18.  The

6    letter requested that Restoration Hardware provide written assurances that it would comply with

7    Emeco's demands by September 27, 2012, and stated that if Restoration Hardware did not,

8    Emeco would initiate legal proceedings to enjoin Restoration Hardware's unlawful conduct.  *Id.*

9         On or about September 21, 2012, Restoration Hardware modified its website to remove all

10   references to "Naval Chair" in describing its chairs and stools.  *Id.* ¶ 21.  The infringing products,

11   now just named the "Aluminum" line, nevertheless remained for sale.  *Id.*  On September 27,

12   Restoration Hardware's counsel sent Emeco's counsel a letter stating that it would respond to

13   Emeco's September 20 letter sometime "next week."  *Id.* ¶ 22, Ex. 19.  On September 28,

14   Restoration Hardware's counsel sent another letter stating a "few preliminary comments and

15   questions," but otherwise refusing to comply with Emeco's demands.  *Id.* ¶ 23, Ex. 20.

16        On October 1, 2012, Emeco filed this lawsuit, asserting, *inter alia*, claims for federal trade

17   dress and trademark infringement under the Lanham Act.  *Id.* ¶ 24, Ex. 21.  On October 3,

18   Restoration Hardware's counsel informed Emeco's counsel that Restoration Hardware had ceased

19   selling its "Naval Chair" products.  *Id.* ¶ 25.  The products remain visible on the Restoration

20   Hardware website, with the statement that they are "No Longer Available."  *Id.*, Ex. 22.

21   **III.    STANDARD**

22        "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

23   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

24   balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

25   *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[3]

26   ---

[3] In the Ninth Circuit, "'serious questions going to the merits' and a balance of hardships that tips

27   sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the
     plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

28   public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
                                                     CASE NO.  CV 12-05072 MMC

1

## IV.   EMECO IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE DRESS AND TRADEMARK INFRINGEMENT CLAIMS

2

3

To sustain a claim for trade dress infringement, Emeco must prove: "(1) that its claimed

4

dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it

5

is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product

6

or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc.*,

7

251 F.3d 1252, 1258 (9th Cir. 2001).  Similarly, to prevail on a claim of trademark infringement,

8

Emeco must prove: "(1) that it has a protectable ownership interest in the mark; and (2) that the

9

defendant's use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v.*

10

*Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).  Emeco is likely to succeed

on both its trade dress and trademark infringement claims.

11

### A.   The Navy Chair® Trade Dress and Trademarks Are Entitled to a "Strong Presumption" of Validity Which Restoration Hardware Cannot Overcome

12

13

"[F]ederal registration provides 'prima facie evidence'" of a trademark's "validity and

14

entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark."  *Zobmondo*

15

*Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C.

16

§§ 1057(b), 1115(a)).  For trade dress, this presumption covers nonfunctionality, *Vuitton Et Fils*

17

*S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775 (9th Cir. 1981), and for both trade dress and

18

trademark, the requirement that the mark is inherently distinctive or has acquired secondary

19

meaning, *Falls Media*, 602 F.3d at 1113.  If registered, the "burden shifts to the defendant to

20

show by a preponderance of the evidence that the mark is not protectable."  *Id*. at 1114; *see*

21

*Publ'ns Int'l, Ltd. v. Landoll, Inc*., 164 F.3d 337, 339-40 (7th Cir. 1998) (with registration,

22

"defendant has the laboring oar on all issues relating to validity, including functionality").

23

Restoration Hardware cannot satisfy its burden.  As noted, Emeco is the owner of U.S.

24

federal registration nos. 2,511,360 and 3,191,187, which cover the design and outline of the Navy

25

Chair®, and U.S. federal registration nos. 3,016,791 and 3,912,854, which cover the trademarks

26

"Navy Chair" and "111 Navy Chair."  Blavin Decl. ¶¶ 7-10, Exs. 6-9.  Emeco is thus entitled to a

27

"strong presumption" that the Navy Chair® trade dress and trademarks are valid and protectable.

28

1   Further, because the trade dress marks and the "Navy Chair" mark have obtained incontestable

2   status, this is "'conclusive evidence of the validity of the registered mark.'" *Reno Air Racing*

3   *Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) (quoting 15 U.S.C. § 1115(b)).

4   **1.      The Navy Chair® Design Is Protectable Trade Dress**

5   **a.      The Navy Chair® Design Is "Nonfunctional"**

6   The Ninth Circuit assesses four factors in analyzing functionality: "(1) whether the design

7   yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether

8   advertising touts the utilitarian advantages of the design, and (4) whether the particular design

9   results from a comparatively simple or inexpensive method of manufacture." *Clicks Billiards,*

10   *Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1260 (9th Cir. 2001).  Each factor supports a finding of

11   nonfunctionality for the design of the Navy Chair®.

12   Regarding the first factor, the design "must be examined as a whole, not by its individual

13   constituent parts," and thus the "fact that many of the individual features" of the design may be

14   "functional" does "not preclude protection." *Clicks Billiards*, 251 F.3d at 1259, 1261.  Here,

15   various arbitrary design elements of the Navy Chair® together comprise a non-functional

16   aesthetic independent of any utilitarian advantage, including the rounded bends at the top corners

17   on the upper back of the seat, which also form the back legs; the rounded curve on the lower back

18   of the seat; the overall concave curvature of the chair back (when viewed from the back); the

19   number, space, and positioning of the three vertical bars connecting the upper and lower curves of

20   the back of the seat; the unique, molded seat defined by concave curves meeting in the center of

21   the seat to form a triangle "butt dip"; the pie-shaped cross section of the tapered front legs; the

22   two curved horizontal bars running between the corresponding front and back chair legs in the

23   chair and armchair versions, and for the stool versions, between the two front legs and two back

24   legs; the positioning and angle of the curved horizontal bar(s) on the lower base of the seat; the

25   outward bend of the back legs; the lack of fasteners, yielding a sculpture-like, one-piece design;

26   and the distinct hand brushed finish with the contrasting direction where the leg meets the seat

27   bottom.  Buchbinder Decl. ¶ 17.  These are all arbitrary, non-functional elements of the chair that

28   define its unique aesthetic design in the market.  *See, e.g., Cosmos Jewelry Ltd. v. Po Sun Hon*

*Co.*, 470 F. Supp. 2d 1072, 1085 (C.D. Cal. 2006) (product design has "a subjectively aesthetic, rather than utilitarian, advantage"), *aff'd*, 2009 WL 766517 (9th Cir. Mar. 24, 2009).  Indeed, the fact that the chair is in the collections of modern art museums and has been praised by design experts around the world confirms its significant aesthetic value.  *See, e.g., Metro Kane Imports, Ltd. v. Rowoco, Inc.*, 618 F. Supp. 273, 276 (S.D.N.Y 1985) (finding trade dress of orange juice squeezer nonfunctional; noting that "placement" in "the catalog of the Museum of Modern Art is a testament to its design quality"), *aff'd*, 800 F.2d 1128 (2d Cir. 1986).

Although the Navy Chair® undoubtedly has several compelling utilitarian features, including its strength and durability, these characteristics are due to the material the chair is made of and its method of manufacture rather than its design.  Buchbinder Decl. ¶ 18.  As the Ninth Circuit has held, "'[i]t is crucial that the enquiry not focus on the usefulness of the article overall, but rather must focus on the utility of that exact feature or combination of features *that is claimed as a protectable trade dress or mark*.  The issue is not whether a product is functional, but whether this particular shape and form of product *which is claimed as trade dress is functional*.'"  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998) (emphases added) (quoting 1 McCarthy on Trademarks and Unfair Competition § 7:70 (4th ed. 1998)); *see also Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1133 (N.D. Cal. 2009) ("furniture may incorporate functional elements but still be worthy of trademark protection").

With respect to the second factor, the existence of commercially-available alternative designs strongly supports a finding of nonfunctionality.  Indeed, the "ultimate issue on functionality is whether [a plaintiff's] 'particular integration of elements leaves a multitude of alternatives to the' . . . 'industry that would not prove confusingly similar to' its trade dress."  *Clicks Billiards*, 251 F.3d at 1261.  Here, Restoration Hardware could have selected from a multitude of alternative designs for aluminum-based chairs that did not copy, identically, the *complete* design of the Navy Chair®.  Indeed, the stores Crate and Barrel and Home Decorators, for example, both sell aluminum chairs that have, amongst other things, an entirely different seat back than the Navy Chair®, with four wavy lines that bend backward, and without a rounded curve on the lower part of the seat back:

1

2

3

4

5

6

7

8

| **Emeco Navy Chair®** | **Crate and Barrel** | **Home Decorators** |
| --- | --- | --- |
|  |  |  |

9   Blavin Decl. ¶¶ 26-27, Exs. 1, 23-24.  While these other brands may use certain elements of the

10  Navy Chair® design, "none combine all of these elements together" to the "effect identified" in

11  Emeco's trade dress, and thus "protecting the particular combination of elements" in the Navy

12  Chair® "will not hinder competition" in the industry.  *Fiji Water Co., LLC v. Fiji Mineral Water*

13  *USA, LLC*, 741 F. Supp. 2d 1165, 1174 (C.D. Cal. 2010).  As this Court held in *Beats Electronics,*

14  *LLC v. Fanny Wang Headphone Co.*, 2011 WL 31198 (N.D. Cal. Jan. 5, 2011) (Chesney, J.), the

15  fact that a product "may perform" a "function" does not mean that it is functional if the product

16  could perform the same function if "designed as a circle, an oval or some other geometric shape."

17  *Id.* at *4; *see also Clicks Billiards*, 251 F.3d at 1260-61 ("various arbitrary elements of Clicks'

18  trade dress" support finding of nonfunctionality).  That is the case here.

19          As to the third factor, Navy Chair® advertisements tout the design's aesthetic beauty,

20  independent of any utilitarian advantages.  *See, e.g., Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL

21  2571719, at *4 (N.D. Cal. June 30, 2012) (advertising touting "aesthetic beauty" of Apple

22  products supports nonfunctionality); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp.

23  2d 1168, 1178 (N.D. Cal. 2007) (ads that "describe the aesthetic beauty of the tiles" support

24  nonfuctionality).  For example, the retailer Design Public states that the "extraordinary simple

25  clean shape" of the Navy Chair® has "made it a modern design classic."  Blavin Decl. ¶ 28, Ex.

26  25.  Other retail sites have made similar statements in their promotion of the Navy Chair®.  *See,*

27  *e.g., id.* ¶ 29, Ex. 26 ("The Emeco Navy chair is a classic icon of modern design" and "is

28  brimming with classic good looks and style."); *id.* ¶ 30, Ex. 27 ("As a plus, the chairs are

1    beautiful" "simple" and "clean").  Similarly, Emeco includes on its Tumblr page (a blog hosting

2    platform) a quote from Sir Terence Conran, a prominent English designer, describing the chair as

3    a *"beautiful and durable version* to the original design spec." *Id.* ¶ 31, Ex. 28 (emphasis added).[4]

4          Regarding the fourth factor, the Emeco Navy Chair® design does not "reflect cost-cutting

5    or simplified manufacturing processes or otherwise unproved methods of manufacture."  *Apple*,

6    2012 WL 2571719, at *4.  To the contrary, the Emeco manufacturing process is, as discussed,

7    incredibly comprehensive and rigorous.  *See Fiji Water*, 741 F. Supp. 2d at 1175 (finding

8    nonfunctionality where "FIJI manufactures its bottles on-site in Fiji, even though it is more

9    expensive, to assure the highest quality standards").  Indeed, the fact that Emeco uses an

10   expensive and rigorous 77-step process to produce the chair, whereas Restoration Hardware can

11   produce a nearly-identical replica through a cheap manufacturing process, indisputably

12   demonstrates that the chair's design is *not* dictated by cost or utility concerns in the

13   manufacturing process.  *See* Buchbinder Decl. ¶ 19.

14                **b.**      **The Navy Chair® Design Has Secondary Meaning**

15         Because the Navy Chair® trade dress and marks have obtained "incontestable" status, this

16   "serves as conclusive proof" that the marks have "secondary meaning" in the marketplace.

17   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002); *see also adidas-*

18   *America, Inc. v. Payless Shoesource, Inc*., 546 F. Supp. 2d 1029, 1056 (D. Or. 2008) (adidas

19   "Trade Dress ha[s] acquired distinctiveness through secondary meaning.  adidas owns a valid and

20   incontestable registration" which "serves as conclusive proof" of "secondary meaning").[5]

21   _____

22   [4] That Emeco and its retail partners also tout the utilitarian advantages of the material of the Navy
     Chair® and Emeco's unique and rigorous *manufacturing process*, as opposed to the chair's
23   *design*, is irrelevant because the "advertising must tout the utilitarian advantages of the feature
     *claimed as trade dress*, not some other aspect of the product."  1 McCarthy on Trademarks and
24   Unfair Competition § 7:74 (4th ed. 1998) (emphasis added).  *See also Fiji Water Co., LLC v. Fiji
     Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1175 (C.D. Cal. 2010) (water bottle
25   nonfunctional where plaintiff does "not tout any utilitarian aspects of its design in its advertising"
     as opposed to functional benefits of water); *In re Browning*, 217 U.S.P.Q. 933 (T.T.A.B. 1982)
26   (advertising touting the sighting advantages of a shotgun did not prove functionality because
     "claimed utilitarian advantage, if it exists, is only tangentially related to the receiver design").

27   [5] Product design cannot be inherently distinctive, and thus is only protectable upon a showing of
28   secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212, 216 (2000).

1    In any event, there is substantial evidence that the Navy Chair® trade dress has acquired

2    distinctiveness through secondary meaning.  First, Restoration Hardware's indisputable "copying

3    strongly supports an inference of secondary meaning."  *Vision Sports, Inc. v. Melville Corp.*, 888

4    F.2d 609, 615 (9th Cir. 1989); *see also Cosmos Jewelry Ltd. v. Po Sun Hon, Co.*, 2004 WL

5    1515943, at *9 (C.D. Cal. Apr. 5, 2004) ("What holds more evidentiary value" for secondary

6    meaning is that "Defendant has attempted to plagiarize Plaintiff's trade dress by creating jewelry

7    that is 'strikingly similar'").  As the Ninth Circuit has explained, "[t]here is no logical reason for

8    the precise copying save an attempt to realize upon a secondary meaning that is in existence."

9    *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557-58 (9th Cir. 1960).[6]

10   Moreover, Emeco has spent substantial advertising and marketing sums extensively

11   promoting the Navy Chair® design, and it even incorporates the chair's design in the company's

12   logo.  This is strong evidence that the Navy Chair® design has acquired secondary meaning.  *See

13   Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999)

14   (evidence of secondary meaning includes "amount and manner of advertising").  Furthermore,

15   Emeco has exclusively used the Navy Chair® design *for decades*, Buchbinder Decl. ¶ 14,

16   *Filipino*, 198 F.3d at 1151 ("exclusivity, manner, and length of use of a mark" support secondary

17   meaning), has had numerous articles written about the company and the Navy Chair®, and has

18   been the focus of several television features highlighting the chair, including on CNN and HGTV,

19

20   [6] Similarly, the existence of other third-party counterfeiters *supports* an inference of secondary
     meaning.  *See, e.g., Creative Tech., Ltd. v. SRT, Inc.*, 1993 WL 603292, at *2 (N.D. Cal. Nov. 8,

21   1993) ("attempts to plagiarize the mark" supports secondary meaning).  Restoration Hardware
     cannot point to the acts of other third-party counterfeiters to excuse its unlawful conduct.  *See,*

22   *e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 154-55 (9th Cir. 1963)
     ("If in the past two other brewers [infringed], that would constitute no defense or justification for

23   the defendants here."); *U.S. Jaycees v. S.F. Jr. Chamber of Commerce*, 354 F. Supp. 61, 73 (N.D.
     Cal. 1972) ("Numerous cases have rejected this defense, holding that the existence of infringers

24   other than the defendant was irrelevant."), *aff'd*, 513 F.2d 1226 (9th Cir. 1975).  Likewise, that
     third parties may be selling similar designs incorporating certain elements of the Navy Chair® is

25   immaterial because "[i]solated or piecemeal third party uses of various elements of [a product's]
     trade dress do not detract from the distinctiveness of the *overall impression conveyed by the*

26   *combination of those elements*" in the product.  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537

27   (11th Cir. 1986) (emphasis added).  As shown above, there are clear distinctions between the
     design of the Emeco Navy Chair® products and those of third parties.  *See supra* at 15-16.

28

PL'S MOT. FOR PRE. INJ. & MPA IN SUPPORT;
CASE NO. CV 12-05072 MMC

1   *see* Blavin Decl. ¶¶ 4, 6, Exs. 3.1-3.9 & 5; *Givenchy S.A. v. BCBG Max Azria Group, Inc*., 2012

2   WL 3072327, at *4 (C.D. Cal. Apr. 25, 2012) ("Unsolicited media coverage is another factor in

3   the secondary meaning inquiry."); *Imagineering, Inc. v. Van Klassens, Inc*., 53 F.3d 1260, 1263-

4   64 (Fed Cir. 1995) (furniture line distinctive where "[d]esign magazines and trade journals

5   published many editorials commenting" on line and "often used photographs" of furniture).

6          Furthermore, that the Navy Chair® design is in the permanent collections of modern art

7   museums around the world and has won several design awards (including the 111 Navy Chair®),

8   Buchbinder Decl. ¶¶ 5-6, supports the existence of secondary meaning.  *See Cosmos Jewelry Ltd.*,

9   2004 WL 1515943, at *9 (finding secondary meaning where plaintiff's "designers have even won

10  awards" for product); *Fiji Water*, 741 F. Supp. 2d at 1176 (that plaintiff "won international

11  awards" for "design innovation" "is strong evidence" that trade dress distinctive); *Van Klassens*,

12  53 F.3d at 1264 (furniture recognized in "design competition" and "featured in the Cooper–

13  Hewitt Museum" shows distinctiveness).

14                    **2.      The Navy Chair® Mark Is a Protectable Trademark**

15         Because, like the Navy Chair® trade dress marks, the Navy Chair® trademark is a

16  registered mark that has obtained incontestable status, *see* Blavin Decl. ¶¶ 7-10, Exs. 6-9, its

17  validity cannot be challenged on the grounds that it is merely descriptive.  *See Reno Air Racing*,

18  452 F.3d at 1135 ("[A] defendant in a trademark infringement action cannot assert that an

19  incontestable mark is invalid because it is descriptive and lacks secondary meaning.").

20         Moreover, because the Navy Chair® trademark has obtained incontestable status, this

21  "serves as conclusive proof" that the mark has "secondary meaning."  *Entrepreneur Media*, 279

22  F.3d at 1142 n.3.  And at any rate, for several of the reasons listed above with respect to the Navy

23  Chair® trade dress, there likewise is substantial evidence establishing that the mark has achieved

24  secondary meaning, including Restoration Hardware's blatant copying of the mark with its

25  "Naval Chair" mark, Emeco's substantial and extensive advertising and marketing expenditures

26  regarding the Navy Chair® mark, Emeco's long-time and exclusive use of the Navy Chair®

27  mark, and the fact that Emeco has been the focus of numerous articles and television features

28  about the company and the Navy Chair®.

**B.      There Exists a Likelihood of Consumer Confusion with Respect to Both the Navy Chair® Trade Dress and Trademark**

There is a likelihood of confusion with respect to both Emeco's trade dress and trademark infringement claims.

Because Restoration Hardware is selling counterfeit goods,[7] with replica trade dress and the near-identical "Naval Chair" name, its products are inherently confusing with Emeco's Navy Chair® collection and the traditional 8-factor *Sleekcraft* analysis is unnecessary.  *See Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) ("[i]n cases involving counterfeiting, it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently confusing").[8]  As this Court stated in *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, 2007 WL 328696 (N.D. Cal. Feb. 2, 2007) (Chesney, J.), in which it issued a permanent injunction to halt the sale of counterfeit goods, where the products appear "the same as, or substantially indistinguishable," a "likelihood of confusion is established."  *Id*. at *2.  Restoration Hardware has practically conceded as much, removing "Naval Chair" from its website and then apparently ceasing sales of the products.  *See, e.g., WWP, Inc. v. Wounded Warriors, Inc*., 566 F. Supp. 2d 970, 979 (D. Neb. 2008) (party "admits" "consumer confusion exists" and in "effort to mitigate this confusion" has "changed its name").

And although it is unnecessary to analyze individually the *Sleekcraft* factors here,[9] they all

---

[7] Restoration Hardware's wholesale replication of the design of the Navy Chair® collection and its use of the near-identical "Naval Chair" name demonstrate that it has trafficked in counterfeit goods.  And in any event, "a mark does not have to be an exact replica of a registered trademark to be deemed a counterfeit."  *United States v. Lam*, 677 F.3d 190, 199 (4th Cir. 2012).  "Such an interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways.'"  *United States v. Guerra*, 293 F.3d 1279, 1288 (11th Cir. 2002).

[8] *See also Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); *Herman Miller Inc. v. Alphaville Design Inc*., 2009 WL 3429739, at *7 (N.D. Cal. Oct. 22, 2009) (where "counterfeit furniture is identical to, or substantially indistinguishable from" plaintiff's, "actual confusion" is "presumed"); *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004) (counterfeit marks "inherently confusing"); *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp*., 174 F.3d 1036, 1056 (9th Cir. 1999) (where "virtual identity" between marks, "likelihood of confusion" follows as "matter of course").

[9] The *Sleekcraft* factors are: "similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of [Emeco's] mark; marketing channels

strongly demonstrate a likelihood of confusion.  First, as demonstrated, there already are several

instances of actual confusion in which consumers have stated that the Restoration Hardware

products are endorsed by, or somehow affiliated with, Emeco.  As noted, one consumer even

described the "Naval Chair" as the "real thing at less than half the price."  *See* Blavin Decl. ¶ 15,

Ex. 14.[10]  Courts have held that "even one example of actual consumer confusion bolsters a

finding of likelihood of confusion."  *United Parcel Serv., Inc. v. Package Am., Inc*., 1996 WL

376610, at *3 n.6 (N.D. Cal. May 9, 1996).  Further, even if consumers of Restoration Hardware

were not themselves confused, the "law in the Ninth Circuit is clear that '*post-purchase*

*confusion*,' *i.e.*, confusion on the part of *someone other than the purchaser who, for example*,

*simply sees the item after it has been purchased*, can establish the required likelihood of

confusion under the Lanham Act."  *Au-Tomotive Gold, Inc. v. Volkswagen of Am,, Inc*., 457 F.3d

1062, 1077-78 (9th Cir. 2006) (emphases added).  The harm from post-purchase confusion is

particularly acute here given that Restoration Hardware's products may be displayed in homes,

offices, hotels, restaurants, and other public places throughout the world.  Consumers who see the

inferior Restoration Hardware knockoffs may confuse them with Emeco's Navy Chairs®, and

Emeco "may be harmed if the widespread existence of knockoffs decreases the original's value

. . . ."  *Gen. Motors Corp. v. Keystone Auto. Indus., Inc*., 453 F.3d 351, 358 (6th Cir. 2006)

("Even without point-of-sale confusion, knockoffs can harm" the "manufacturer").

Moreover, Restoration Hardware's intent to copy Emeco's Navy Chair® is obvious.  It

not only created virtual replicas of the trade dress design, but even used the near-identical "Naval

Chair" name.  Where "counterfeit furniture is identical to, or substantially indistinguishable from"

---

used; degree of care likely to be exercised by purchasers in selecting goods; [Restoration
Hardware's] intent in selecting its mark; evidence of actual confusion; and likelihood of
expansion in product lines."  *Brookfield*, 174 F.3d at 1053-54.

[10] Courts repeatedly have held that Internet postings showing actual consumer confusion are
admissible and highly relevant.  *See QVC, Inc. v. Your Vitamins, Inc*., 714 F. Supp. 2d 291, 302
n.19 (D. Del. 2010) ("Blog posts . . . may be more reliable than broad-based surveys, insofar as
they represent direct feedback from consumers specifically interested in the product(s) at issue.");
*Volkswagen AG v. Verdier Microbus and Camper, Inc*., 2009 WL 928130, at *4 (N.D. Cal. Apr.
3, 2009) ("[S]everal Internet articles and blogs . . . suggest that consumers believe the Verdier
vehicle is a VW product. . . . weigh[ing] in favor of a finding of actual confusion.").

1  the plaintiff's, and labeled with a near-identical name, this "is sufficient to show that [the

2  defendant] intentionally copied plaintiff's marks." *Herman Miller*, 2009 WL 342973, at *7.

3  Restoration Hardware's willful intent is further confirmed by the fact that it has been sued in

4  similar actions in the past and has made a business practice of misappropriating others' designs.

5  *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (in finding willful

6  infringement, noting that "defendants had been sued in a similar trademark infringement case in

7  the past"); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (same).

8          The remaining *Sleekcraft* factors all favor a likelihood of confusion:  the conflicting

9  designations are not only similar, they are virtually identical; there is a high degree of relatedness

10  between both Emeco and Restoration Hardware's businesses, as both sell furniture products

11  throughout the United States; Emeco's trade dress and marks are strong and have achieved

12  incontestable status; both channels use the same or similar marketing channels, such as print and

13  the Internet, with a particular emphasis on design and furniture; consumers may not exercise

14  sufficient care in purchasing products from Restoration Hardware, under the assumption that an

15  established company would not be selling cheap knockoffs from overseas; and Restoration

16  Hardware already has copied the entire Navy Chair® collection.  *Brookfield*, 174 F.3d at 1053.

17  **V.      EMECO WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION**

18          Under settled law, Emeco is suffering irreparable injury that cannot be remedied by

19  money damages as Restoration Hardware's Naval Chairs threaten Emeco with the loss of

20  business, goodwill, and its reputation.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

21  F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill

22  certainly supports a finding of the possibility of irreparable harm.").  These threats are made no

23  less imminent by the fact that Restoration Hardware has removed the "Naval Chair" name from

24  its website, and purportedly ceased sales of the "Naval Chair" products.

25          With its counterfeiting of Emeco's signature product, Restoration Hardware has hijacked

26  the strong reputation Emeco has spent substantial resources over decades to build.  *See SunEarth,*

27  *Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (irreparable

28  harm where "Plaintiffs have invested significant time in building up a strong reputation over the

1   course of several decades"). Emeco considers the Navy Chair® to be its signature product and a

2   symbol of the company, which is reflected by the fact that its logo is the chair itself. Buchbinder

3   Decl. ¶ 16. And as described, the Navy Chair® has earned Emeco numerous rewards and

4   widespread recognition for its iconic design and durability. *Id.* ¶¶ 7, 9.

5        Beyond potential lost sales, Restoration Hardware's unauthorized sale and promotion of

6   its "Naval Chair" line threatens Emeco with loss of its reputation and significant goodwill.

7   Consumers purchasing the inferior "Naval Chair" products, or observing them in public spaces,

8   will begin to attribute their inferior quality to Emeco. *Id.* ¶ 30; *see Paulsson Geophysical Servs.,*

9   *Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008) ("[The plaintiff] had lost control of the quality

10  of the [product] that was being associated with its mark."). Moreover, Restoration Hardware's

11  low price point for the "Naval Chair" cheapens the entire Navy Chair® product line and the

12  Emeco brand, reducing consumer expectations as to what a genuine Navy Chair® should cost and

13  causing consumers to seek out other counterfeits with a similarly low price point. Buchbinder

14  Decl. ¶ 31; *see also Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*, 2007 WL 535041, at *10

15  (W.D. Ark. Feb. 16, 2007) (accepting as proof of irreparable injury that below-market sales

16  "cheapen" brand image). This further may destroy the goodwill Emeco has built up with original

17  purchasers of genuine chairs, as well as prospective consumers of the Navy Chair® who believe

18  that the mass-marketed "Naval Chairs" devalue the originals. Buchbinder Decl. ¶ 30.

19       Restoration Hardware's purported voluntary cessation of its infringing conduct does not

20  lessen the need for an injunction here. Restoration Hardware has "willfully violated" Emeco's

21  "trademark rights," "refused to stop violating those rights until" Emeco "brought suit in federal

22  district court," and thus Emeco is not required to introduce evidence that it is "likely to infringe

23  again" to obtain an injunction. *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th

24  Cir. 1986); *see also Levi Strauss*, 121 F.3d at 1314 (same); *Rolex Watch U.S.A., Inc. v. Zeotec*

25  *Diamonds, Inc.*, 2003 WL 23705746, at *5 (C.D. Cal. Mar. 7, 2003) (under *Polo Fashions*

26  injunctive relief is "not mooted when a defendant voluntarily ceases all wrongful operations").

27  Emeco is "'entitled to effective relief; and any doubt in respect of the extent thereof must be

28  resolved" in Emeco's "favor as the innocent producer" and "against" Restoration Hardware,

1    "which has shown by its conduct that it is not to be trusted.'" *Levi Strauss*, 121 F.3d at 1314.

2         Despite Restoration Hardware's efforts to mitigate the irreparable harm it inflicted on

3    Emeco's reputation, it has to date promised nothing as to whether it will continue to be a threat to

4    Emeco's exclusive rights.  It has not stipulated to an injunction barring all infringing uses of

5    Emeco's rights, and, for example, requiring it to rid its inventory of the counterfeit chairs and to

6    destroy any infringing marketing materials, including any remaining stock.  *Rebel Debutante LLC*

7    *v. Forsythe Cosmetic Group, Ltd.*, 799 F. Supp. 2d 558, 567 (M.D.N.C. 2011) ("Even when a

8    defendant has ceased production, it has not met its 'heavy burden' [of showing mootness] unless

9    it shows that it would be unable to resume production in the future."); *see also PetMed Express,*

10   *Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1223 (S.D. Fla. 2004) (similar).

11        And substantial protection is what Emeco deserves where Restoration Hardware has

12   illegally promoted to the public a blatant counterfeit of Emeco's core product line through

13   millions of distributed catalogues, each containing a full-page promotion of the chair, and the

14   "Naval Chairs" themselves remain visible on the Restoration Hardware website.  Blavin Decl.

15   ¶ 12, Ex. 11.[11]  These infringing promotions will continue to confuse the public into believing

16   that Restoration Hardware's chairs are genuine and authentic.  *See Summit Entm't, LLC v. Beckett*

17   *Media, LLC*, 2010 WL 147958, at *4 (C.D. Cal. Jan. 12, 2010) (injunction not mooted where

18   infringing magazines "still widely available in [an area's] retail stores and over the Internet").

19   **VI.    THE BALANCE OF HARDSHIPS SHARPLY TIPS IN EMECO'S FAVOR**

20        As the threat of irreparable harm to Emeco is substantial, the balance of hardships sharply

21   tips in its favor.  *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 157 (E.D.N.Y.

22   2011).  In addition, Restoration Hardware has willfully sought to capitalize on the iconic product

23   design of the Navy Chair® to attract customers who would otherwise buy from Emeco.

24   Buchbinder Decl. ¶ 30; *see Diller v. Barry Driller, Inc.*, 2012 WL 4044732 (C.D. Cal. Sept. 10,

25   2012) (hardship to plaintiff where defendant used domain barrydriller.com to capitalize on

26   ─────────────────

27   [11] As of October 9, 2012 the "Naval Chairs" remain on the Restoration Hardware website.  Blavin
     Decl., Ex. 22.  The continued existence of these webpages shows not only that Restoration
     Hardware is presently infringing the Navy Chair® trade dress rights but also that the company is

28   fully capable of resuming promotions and sales of the chair.

1    success of Barry Diller's identical service to webstream tv).  By contrast, "the injury a defendant

2    might suffer if an injunction were imposed [in a trademark infringement suit] may be discounted

3    by the fact that the defendant brought that injury upon itself."  *Novartis Consumer Health, Inc. v.*

4    *Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

5           Moreover, the burden on Restoration Hardware is minimal given that it already has

6    claimed to have ceased selling the infringing products.  Restoration Hardware should have no

7    objections to an injunction covering ceased activity: "If the defendants sincerely intend not to

8    infringe, the injunction harms them little; if they do, it gives [the plaintiff] substantial protection

9    of its trademark."  *Polo Fashions*, 793 F.2d at 1135-36.

10   **VII.    AN INJUNCTION FURTHERS THE PUBLIC INTEREST**

11          The Ninth Circuit has explained that the "usual public interest concern in trademark cases

12   [is] avoiding confusion to consumers."  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.,*

13   *Inc.*, 559 F.3d 985, 993 (9th Cir. 2009); *see also Creative Labs, Inc. v. Cyrix Corp.*, 141 F.3d

14   1174, 1998 WL 141183, at *1 (9th Cir. 1998) (unpublished) (finding injunction to further public

15   interest "by avoiding customer confusion").  For the reasons discussed above, Restoration

16   Hardware's counterfeit "Naval Chairs" are likely to cause confusion as to the source of that

17   product, and therefore the requested relief is in the public interest.[12]

18   **VIII.   CONCLUSION**

19          Emeco respectfully requests that the Court enter the proposed injunction.

20

21   DATED:  October 10, 2012                      MUNGER, TOLLES & OLSON LLP

22

23                                                 By:  _____*/s/ John W. Spiegel*_____
                                                        JOHN W. SPIEGEL

24                                                 Attorneys for Plaintiff Emeco Industries, Inc.

25

26   _____

27   [12] No security under Federal Rule of Civil Procedure 65(c) should be required.  First, Restoration
     Hardware apparently has ceased selling the products, therefore it is willing and able to assume

28   any monetary loss risk as a result of an injunction.  Further, any harm Restoration Hardware faces
     from an injunction results from its voluntary decision to violate Emeco's rights.