1   WESLEY E. OVERSON (CA SBN 154737)
    WOverson@mofo.com
2   JENNIFER LEE TAYLOR (CA SBN 161368)
    JTaylor@mofo.com
3   NATHAN B. SABRI (CA SBN 252216)
    NSabri@mofo.com
4   JULIA D. KRIPKE (CA SBN 267436)
    JKripke@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone: 415.268.7000
7   Facsimile: 415.268.7522

8   Attorneys for Defendants
    RESTORATION HARDWARE, INC. and GARY FRIEDMAN
9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14   EMECO INDUSTRIES, INC.,                     Case No. 3:12-cv-5072 MMC

15                Plaintiff,                      **DEFENDANTS RESTORATION
                                                 HARDWARE AND GARY
16         v.                                    FRIEDMAN'S OPPOSITION TO
                                                 PLAINTIFF'S MOTION FOR
17   RESTORATION HARDWARE, INC., GARY            PRELIMINARY INJUNCTION**
     FRIEDMAN, and Does 1-10,
18                                               Date:   Dec. 14, 2012
                 Defendants.                     Time:   9:00 a.m.
19                                               Ctrm:   7

20                                               Hon. Maxine M. Chesney

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

ARGUMENT ...................................................................................................................... 6

I.     PLAINTIFF CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS ................... 6

     A.     Plaintiff's Asserted Rights Are Not Protectable. ................................... 7

           1.     Plaintiff's THE NAVY CHAIR mark and chair trade dress are generic. ......................................................................................... 8

                 a.     Plaintiff's THE NAVY CHAIR mark is generic. .......................... 8

                 b.     Plaintiff's trade dress is generic. ................................................. 10

                 c.     Plaintiff's trade dress is functional. ............................................. 11

     B.     Plaintiff Has Not Shown a Likelihood of Confusion. .......................... 14

           1.     Key *Sleekcraft* factors establish that confusion between Plaintiff's trade dress and trademarks and Restoration Hardware's chairs is not likely. ................................................................................................. 15

                 a.     Plaintiff's trade dress and trademarks are very weak ................... 15

                 b.     There is no evidence of significant actual confusion. ................... 16

                 c.     The parties use different trade channels. ...................................... 17

                 d.     Consumers exercise a high degree of care. .................................. 18

                 e.     Restoration Hardware did not intend to cause confusion with Plaintiff's chairs. ....................................................................... 18

                 f.     The word marks are not sufficiently similar to cause confusion ...................................................................................... 18

            2.     Defendants' accused phrases are protected by the defense of fair use. ................................................................................................... 19

II.     PLAINTIFF CANNOT DEMONSTRATE THAT IT IS LIKELY TO SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION ............................................. 21

III.     THE BALANCE OF HARDSHIPS DOES NOT FAVOR ISSUANCE OF A PRELIMINARY INJUNCTION ............................................................................... 23

IV.     THE PUBLIC INTEREST DOES NOT REQUIRE A PRELIMINARY INJUNCTION ......................................................................................................... 25

CONCLUSION ................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Advertise.com, Inc. v. AOL Adver., Inc.*,
    616 F.3d 974 (9th Cir. 2010).................................................................................................. 8

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).............................................................................................. 6

*Am. Cyanamid Corp. v. Connaught Labs., Inc.*,
    800 F.2d 306, 308 (2d Cir. 1986)......................................................................................... 8

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)............................................................................................... 14

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    Case No. C 11-06391 SI, 2012 U.S. Dist. LEXIS 93124 (N.D. Cal. July 5, 2012)................. 6

*Aurora World, Inc. v. TY Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) .............................................................................. 25

*Beats Elecs., LLC v. Fanny Wang Headphone Co.*,
    Case No. C-10-5680 MMC, 2011 U.S. Dist. LEXIS 2228 (N.D. Cal. Jan. 5, 2011) ............. 18

*BoomerangIt, Inc. v. ID Armor, Inc.*,
    Case No. 5:12-cv-0920 EJD, 2012 U.S. Dist. LEXIS 86382 (N.D. Cal. June 21, 2012) ....... 21

*Boston Duck Tours, LP v. Super Duck Tours, LLC*,
    531 F.3d 1 (1st Cir. 2008)..................................................................................................... 8

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999)................................................................................ 6, 18, 21

*Cairns v. Franklin Mint Co.*,
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ........................................................................... 16, 17

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*,
    815 F.2d 500 (8th Cir. 1987)............................................................................................... 25

*Caribbean Marine Services Co. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988)............................................................................................... 22

*Cazet v. Epps*,
    Case No. C 10-02460 JSW, 2010 U.S. Dist. LEXIS 67924 (N.D. Cal. June 11, 2010) ........... 7

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
    468 F. Supp. 2d 1181 (C.D. Cal. 2007) ................................................................................ 8

*ConocoPhillips Co. v. Gonzalez,*
    Case No. 5:12-cv-00576-LHK, 2012 U.S. Dist. LEXIS 20972 (N.D. Cal. Feb. 17, 2012) ................................................................................................................. 21

*Cytosport v. Vital Pharm., Inc.,*
    617 F. Supp. 2d 1051 (E.D. Cal. 2009) ............................................................... 25

*Disc Golf Ass'n v. Champion Discs,*
    158 F.3d 1002 (9th Cir. 1998) ........................................................................ 12, 14

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) .............................................................................................. 21

*Elantech Devices Corp. v. Synaptics, Inc.,*
    Case No. C 06-1839 PVT, 2008 U.S. Dist. LEXIS 116997 (N.D. Cal. Aug. 27, 2008) .......... 6

*Entrepreneur Media v. Smith,*
    279 F.3d 1135 (9th Cir. 2002) ..................................................................... 14-15, 19

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC,*
    741 F. Supp. 2d 1165 (C.D. Cal. 2010) ........................................................... 14-15

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.,*
    198 F.3d 1143 (9th Cir. 1999) ................................................................................. 7

*First Brands Corp. v. Fred Meyer, Inc.,*
    809 F.2d 1378 (9th Cir. 1987) ............................................................................... 16

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.,*
    654 F.3d 958 (9th Cir. 2011) ................................................................................... 7

*Fruit of the Loom, Inc. v. Girouard,*
    994 F.2d 1359 (9th Cir. 1993) ............................................................................... 18

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventists Congregational Church,*
    887 F.2d 228 (9th Cir. 1989) ................................................................................... 7

*Genovese Drug Stores v. TGC Stores,*
    939 F. Supp. 340 (D.N.J. 1996) ............................................................................ 24

*GMT Productions, L.P. v. Cablevision of New York City, Inc.,*
    816 F. Supp. 207 (S.D.N.Y. 1993) .......................................................................... 8

*Groupion, LLC v. Groupon, Inc.,*
    826 F. Supp. 2d 1156 (N.D. Cal. 2011) ................................................................ 21

*Groupion, LLC v. Groupon, Inc.,*
    859 F. Supp. 2d 1067 (N.D. Cal. 2012) ................................................................ 19

*Henri's Food Prods. Co. v. Kraft, Inc.*,
    717 F.2d 352 (7th Cir. 1983) .......................................................................................... 17

*Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*,
    2011 U.S. Dist. LEXIS 147102 (S.D.N.Y. Dec. 22, 2011) .................................................... 13

*Herman Miller Inc. v. Alphaville Design Inc.*,
    Case No. C 08-03437 WHA, 2009 U.S. Dist. LEXIS 103384 (N.D. Cal. Oct. 22, 2009) ...... 15

*Hypoxico Inc. v. Colorado Altitude Training LLC*,
    Case No. 02 Civ. 6191 (TPG), 2012 U.S. Dist. LEXIS 122830 (S.D.N.Y. Aug. 28,
    2012) ................................................................................................................................. 23

*In re Capri Macaroni Corp.*,
    173 U.S.P.Q. 630 (T.T.A.B. 1972) ...................................................................................... 11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    11 F.3d 1460 (9th Cir. 1993) ............................................................................................ 20

*JL Bev. Co., LLC v. Beam, Inc.*,
    2012 U.S. Dist. LEXIS 137076 (D. Nev. Sept. 25, 2012) ............................................... 24-25

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998) .......................................................................................... 11

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*,
    Case No. C 04-4146 MMC, 2007 U.S. Dist. LEXIS 7880 (N.D. Cal. Feb. 2, 2007) ............. 15

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    408 F.3d 596 (9th Cir. 2005) .............................................................................................. 7

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004) ..................................................................................................... 19-20

*Leatherman Tool Group, Inc. v. Coast Cutlery Co.*,
    823 F. Supp. 2d 1150 (D. Or. Oct. 2011) ........................................................................ 21-22

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog*,
    LLC, 507 F.3d 252 (4th Cir. 2007) .................................................................................... 19

*M2 Software, Inc. v. Madacy Entm't*,
    421 F.3d 1073 (9th Cir. 2005) .......................................................................................... 17

*Network Automation, Inc. v. Advanced Sys. Concepts*,
    638 F.3d 1137 (9th Cir. 2011) .......................................................................................... 16

*New Eng. Braiding Co. v. A.W. Chesterton Co.*,
    970 F.2d 878 (Fed. Cir. 1992) ............................................................................................ 6

*Nichia Corp. v. Seoul Semiconductor, Ltd.*,
   Case No. 06-0162 MMC, 2008 U.S. Dist. LEXIS 12183 (N.D. Cal. Feb. 7, 2008) ............... 23

*OG Int'l, Ltd. v. Ubisoft Entm't*,
   Case No. C 11-04980 CRB, 2011 U.S. Dist. LEXIS 124020 (N.D. Cal. Oct. 26, 2011) ....... 22

*Paulsson Geophysical Servs., Inc. v. Sigmar*,
   529 F.3d 303 (5th Cir. 2008) ................................................................................................ 22

*Philip Morris USA Inc. v. Felizardo*,
   Case No. 03 Civ. 5891 (HB), 2004 U.S. Dist. LEXIS 11154 (S.D.N.Y. June 18, 2004) ....... 15

*Phillip Morris USA Inc. v. Shalabi*,
   352 F. Supp. 2d 1067 (C.D. Cal. 2004) ................................................................................. 15

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995) ............................................................................................................. 12

*Rovio Ent'mt Ltd. v. Royal Plush Toys, Inc.*,
   Case No. C ......................................................................................................................... 21

*Rudolph Int'l, Inc. v. Realys, Inc.*,
   482 F.3d 1195 (9th Cir. 2007) ................................................................................................ 8

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) .............................................................................................. 22

*Straumann Co. v. Lifecore Biomedical Inc.*,
   278 F. Supp. 2d 130 (D. Mass. 2003) ................................................................................... 16

*Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*,
   94 U.S.P.Q.2d 1549 (T.T.A.B. 2009) ................................................................................... 11

*Stuhlbarg Intl' Sales Co., Inc. v. Brush and Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) ................................................................................................ 22

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
   846 F. Supp. 2d 1063 (N.D. Cal. 2012) ................................................................................ 22

*Sunrise Jewelry Mfg. Corp. v. Fred S.A.*,
   175 F.3d 1322 (Fed. Cir. 1999) .............................................................................................. 7

*Supelco, Inc. v. Alltech Assocs.*,
   1986 U.S. Dist. LEXIS 21236 (E.D. Pa. 1986) ..................................................................... 24

*Surfvivor Media, Inc. v. Survivor Prods.*,
   406 F.3d 625 (9th Cir. 2005) ................................................................................................ 17

*Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*,
   Case No. 07-2015, 2007 U.S. Dist. LEXIS 11435 (W.D. Ark. Feb. 16, 2007) ..................... 22

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) .................................................................................................... 12, 14

*Tyco Healthcare Group LP v. Applied Med. Res. Corp.*,
    Case No. 9:09-cv-176, 2011 U.S. Dist. LEXIS 154686 (E.D. Tex. Sept. 23, 2011) .............. 23

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    Case No. C 12-2582 CW, 2012 U.S. Dist. LEXIS 85665 (N.D. Cal. June 20, 2012) ........... 15

*Vision Sports, Inc. v. Melville Corp.*,
    888 F.2d 609 (9th Cir. 1989) ................................................................................. 16

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
    465 F. Supp. 2d 956 (N.D. Cal. 2006) ......................................................... 10, 12

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................... 6, 21, 22, 24

## STATUTES

15 U.S.C. § 1115(b)(8) ........................................................................................... 7, 19

15 U.S.C. § 1119 ...................................................................................................... 8

15 U.S.C. § 1127 ...................................................................................................... 19

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(c) ............................................................................................... 26

1

**INTRODUCTION**

2       In 1944, the U.S. Navy asked Emeco to build a chair for use on Navy ships. According to

3  Emeco's director of product management, at that time, Emeco's founder "basically took a generic

4  wood chair, took the design over, and made it in aluminum." (Declaration of Nathan Sabri, Ex.

5  1.) Now, 68 years later, Emeco claims that it owns that generic chair design. However, Emeco

6  cannot sweep the generic nature of the chair's trade dress under the rug. What was generic then

7  remains generic now. Because generic designs cannot be protected, Emeco's so-called

8  "incontestable" trade dress registration is invalid. Emeco cannot show that it is likely to prove

9  that it has valid and protectable rights in its chair's trade dress.

10      Emeco also overreaches as to its claim regarding the NAVY CHAIR trademark. A Navy

11  or naval chair is a generic reference to the type of chair used by the Navy. Emeco cannot own all

12  use of "Navy" or "naval" with "chair" any more than a company could own all use of "lawn"

13  with "chair." A generic term cannot be protected, and Emeco's THE NAVY CHAIR registration

14  is invalid. As with the chair's trade dress, Emeco has not shown that it is likely to be successful

15  in proving that it has valid and protectable rights in the NAVY CHAIR trademark.

16      Emeco separately fails to demonstrate a likelihood of success because it cannot show a

17  likelihood of confusion. Consumers are not likely to be confused as to the source of the "1940s

18  Aluminum Naval Chairs" in the Restoration Hardware catalog. A survey reflects that only 1%

19  (or 1.5% at most) of respondents who viewed the chair in the Restoration Hardware catalog

20  believed it came from Emeco. This falls far short of what case law requires to establish

21  confusion. Additionally, Restoration Hardware's use of the descriptive phrase "1940s Aluminum

22  Naval Chair" was a protected fair use that accurately described the style of the product.

23      Finally, Plaintiff has not shown the irreparable harm necessary to justify the extraordinary

24  relief of a preliminary injunction. Restoration Hardware has not sold a single chair accused in

25  this dispute. Not one. It preempted any sales before a single chair was sent to a store or a

26  customer. Restoration Hardware is holding the chair inventory under lock and key in its

27  warehouses, and the chair no longer appears on its website. There is no need for an injunction

28

1  because no sales have occurred, and they will not occur until there is a ruling on the merits.[1]

2  **STATEMENT OF FACTS**

3  **Origin of Navy Chair Design**.  The Navy set the specifications for what became the 1006

4  Navy Chair during World War II, and then developed it together with Alcoa.  Emeco later built

5  the chair according to those specifications.  As part of the public relations campaign Emeco

6  launched with this lawsuit, Emeco's CEO, Gregg Buchbinder stated:

> Emeco began in 1944.  The US Navy had a problem.  They needed
> something for the Navy ships.  They needed furniture that was
> lightweight, non-corrosive for the salt air, nonflammable, that
> would not affect the instruments so it needed to be nonmagnetic,
> fireproof, and, of course, super durable because the sailors would
> destroy everything on ships.  The Navy worked with Alcoa
> Aluminum, and they developed this chair, and they went to Emeco
> and at that time Emeco produced what is now known as the 1006
> Navy chair.

12  (Sabri Decl. Ex. 2; *see also id.* Ex. 3 ("Emeco's quality guarantee of The Navy Chair® is the

13  result of elaborate and precise specifications developed by the U.S. Navy in 1944 in conjunction

14  with ALCOA Aluminum."); Compl. ¶ 13.)  Mr. Buchbinder explained that this "utilitarian,

15  purpose-built chair" has "become famous because it's built so well."  (Sabri Decl. Ex. 2.)

16  Emeco's director of product development admitted on a video posted by Emeco to its YouTube

17  channel that the founder of Emeco "basically took a generic wood chair, took the design over, and

18  made it in aluminum."  (*Id.* Ex. 1.)

19  **Use of Naval Chairs Since 1940s.**  The simple aluminum chair that the Navy asked

20  Emeco to build in the 1940s has continuously been used on Navy ships over the decades that

21  followed.  (Compl. ¶ 13.)  Thus, the chair has literally been a "naval" chair for more than 60

22  years.  Other companies have also made Navy chairs for decades.  Goodform/General

23  Fireproofing made "Aluminum Army/Navy Chairs" in the 1940s.  (Sabri Decl. Ex. 4.)

24  Chromcraft & Harvard Interiors made "Navy chairs" in the 1960s and 1970s.  (*Id.* Ex. 5.)  In fact,

---

[1] Plaintiff seeks to enjoin both Restoration Hardware and Gary Friedman, but Plaintiff's motion establishes no facts suggesting Mr. Friedman's personal involvement in the allegedly infringing activities or that he is involved in selling or marketing any chairs on his own apart from Restoration Hardware.  An injunction against Mr. Friedman would thus be improper.  The remaining arguments against an injunction made in this brief apply equally to both Restoration Hardware and to Mr. Friedman.

1    the chair appears in a Navy catalog listing procurement data for furnishings approved for

2    shipboard use.  (*Id.* Ex. 6.)  The manufacturer of the Navy chair below is listed as Turnbull

3    Enterprises, Inc., not Emeco:

4

5    

6

7    (*Id.*)  Another entity, Pacific Maritime Industries, Corp., displays a similar product and states on

8    its website that it "manufacture[s] all items in the U.S. Navy's NAVAL SHIPBOARD

9    FURNITURE CATALOG," with a link to the Navy catalog that includes Turnbull's identical

10   Navy chair.  (*Id.* Ex. 7.)  Many other versions of "Navy chairs" are offered on the market today,

11   including aluminum dining "Navy chairs," stackable "Navy chairs," a "New Spec Argent Navy

12   Chair," "Brushed Aluminum Navy Side Dining Chairs," and "Classic Design Navy Chair

13   Aluminum Dining Chair Reproduction."  (*Id.* Exs. 8-13.)  Some have also emphasized the chairs'

14   naval origin, calling them "sailor chairs" and "military style" chairs.  (*Id.* Exs. 14-16.)

15         **Emeco's Trademark Applications.**  Emeco waited more than 50 years before it applied

16   for a trade dress registration for the chair design in 1998.  (Compl. Ex. 1.)  In 2004, sixty years

17   after the Navy developed the chair design, Emeco applied for a trademark registration for the

18   words THE NAVY CHAIR, claiming use of that mark since 1999.  (*Id.* Ex. 2.)  It applied for a

19   trademark registration for a logo comprised of a chair design in 2005 (*id.* Ex.1) and for 111

20   NAVY CHAIR in 2009 (*id* Ex. 2.)

21         **What the Emeco Chair is Named Today.**  As cited above, the CEO of Emeco has

22   recently stated that its chair "is now known as the 1006 Navy chair."  (Sabri Decl. Ex. 2.)

23   Plaintiff writes that it "named the chair with a number: 1006, some people call it the Navy chair.

24   We still call it the Ten-o-six."  (*Id.* Ex. 17.)  The Emeco 1006 Navy chair is currently being sold

25   by retailers as: "1006 Navy® Side Chair" (*id.* Ex. 18), "Emeco 1006 – Navy Dining Chair" (*id.*

26   Ex. 19); and "Emeco Navy Chair (1006 Chair)" (*id.* Ex. 20).  Plaintiff also sells a plastic "111

27   Navy Chair."  (*Id.* Ex. 17.)

28         **Overview of Restoration Hardware's Business.**  Restoration Hardware sells home

furnishings through catalogs, the Internet, and more than 70 retail stores.  (Declaration of Frances Hamman ¶ 1.)  It does not own or operate any manufacturing facilities.  (*Id.*)  It contracts with third-party vendors for the manufacture of its merchandise.  (*Id.*)  Its sourcing strategy focuses on identifying and using vendors that can provide the quality materials and fine craftsmanship that its customers expect, while still offering good value on price. (*Id.* ¶ 2.)

**Sourcing of "1940s Aluminum Naval Chair."**  In May of this year, Restoration Hardware decided to add new products to a fall catalog, which eventually was named "Big Style, Small Spaces."  (*Id.* ¶ 3.)  Several "mid-century modern" chairs were to be part of the new catalog.  (*Id.* ¶ 4.)  Restoration Hardware's sourcing representative in China, Stone Liu, investigated two possible manufacturers of metal chairs, Amanson and Xuda, and each sent exemplars of the chairs that it already had in its line.  (*Id.*)  Restoration Hardware settled on one of the exemplars from Amanson; it was later described as the "1940s Aluminum Naval Chair" in the "Big Style, Small Spaces" catalog.  (*Id.* ¶¶ 5-6.)

**Purchase Orders for Amanson Chairs.**  Restoration Hardware placed purchase orders with Amanson on July 13, 2012.  (*Id.* ¶ 6.)  The chairs were to be delivered to two of Restoration Hardware's distribution centers.  (Declaration of Jason Edelman ¶ 8.)

**The "Big Styles, Small Spaces" Catalog.**  The "Big Styles, Small Spaces" catalog was sent to approximately 8 million homes in the United States in early September 2012.  (*Id.* ¶ 2.)  It included the page with the picture of a chair that Emeco included in its motion alongside the description "Introducing 1940s Naval Chair."  (Mot. at 8.)  The chair also appeared on the Restoration Hardware website with the description "Introducing 1940s Aluminum Naval Chair Collection."  (*Id.* at 9.)

**Withdrawal of Chairs from Sale and from Website.**  After the catalog issued, Emeco complained to Restoration Hardware of trade dress and trademark violations.  (Edelman Decl. ¶ 2.)  Restoration Hardware initially removed the term "naval" from the website, so that the chairs were described as "Standard Aluminum Chairs."  (*Id.*)  Emeco then filed suit on October 1, 2012.  Restoration Hardware withdrew the chairs from sale on October 3, 2012.  (*Id.* ¶ 3.)  The chairs never made it out of the Restoration Hardware warehouses.  (*Id.* ¶ 3; Declaration of Paul

Gargagliano ¶ 5; Declaration of Robert Forte ¶¶ 2-5.)   Restoration Hardware informed customers

who had placed orders already that their orders would not be filled.  (Edelman Decl. ¶ 4.)  These

chairs were never delivered to customers.  (*Id.*)

**Cancellation of Amanson Orders.**  Restoration Hardware cancelled all of its remaining

purchase orders with Amanson on October 3, 2012, and took action to secure whatever inventory

had been manufactured.  (*Id.* ¶ 6, Ex. 1; Hamman Decl., ¶ 7, Ex. 2.)  It confirmed with Amanson

that the inventory that had been built for Restoration Hardware had already shipped and that no

further chairs were in inventory in China or in the process of being manufactured.  (Edelman

Decl. ¶ 7, Ex. 2; Hamman Decl. ¶ 7.)  The first Amanson chairs arrived in the United States at the

Restoration Hardware distribution center in Mira Loma, California, on October 15, 2012, and

subsequent shipments have arrived on October 16 and 22 in Mira Loma and on November 8,

2012, at the Essex, Maryland distribution center.  (Gargagliano Decl. ¶¶ 2-4; Forte Decl. ¶ 2.)

There are currently 2,416 chairs in locked and sealed storage containers at Restoration

Hardware's facilities.  (Edelman Decl. ¶ 9.)  Additional chairs are on ships on their way to the

United States, and these shipments will be held in locked and sealed storage containers when they

arrive.  (Gargagliano Decl. ¶ 9; Forte Decl. ¶ 6.)  Restoration Hardware will not release any of the

chairs from storage until this Court rules on the merits of the case.  (Edelman Decl. ¶ 10.)

**Lack of Confusion as to Source, Affiliation, or Sponsorship.**  Hal Poret, an expert in

consumer surveys, conducted a survey to test whether potential Restoration Hardware customers

would associate Restoration Hardware's chair with Emeco's Navy Chair, or mistakenly believe

the chair, as shown in the catalog, was made by, affiliated with, or authorized by Emeco.

(Declaration of Hal Poret ¶ 7.)  The survey was weighted toward higher-income households

(Restoration Hardware's target customers) and only included persons who had shopped or were

likely to shop at Restoration Hardware for furniture.  (*Id.* ¶ 6, Ex. 1 at 3, 12 & n.1.)  First,

participants were shown the chair alone, and only 1% or 1.5% surveyed associated the look of

that chair with Emeco.  (*Id.* ¶ 6, Ex. 1 at 11, 19, 21.)  When shown the relevant pages of

Restoration Hardware's catalog, only 1% (at most 1.5%) believed the chair was made by,

affiliated with, or authorized by Emeco.  (*Id.* at ¶ 6, Ex. 1 at 11, 19, 21.)  Notably, this survey was

1   conducted *after* Emeco's press blitz resulting in articles in the *Los Angeles Times*, the *New York*

2   *Times*, the *San Francisco Chronicle*, and many other publications.  (Sabri Decl. Ex. 21.)  Many of

3   these articles included photos of the chairs and summarized Emeco's claims in this lawsuit.  (*Id.*)

### ARGUMENT

5        Plaintiff is not entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*

6   *v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) ("[a] preliminary injunction is an

7   extraordinary remedy never awarded as of right").  Plaintiff has not established: (1) a likelihood

8   of success on the merits of its claims; (2) a likelihood that it will suffer irreparable harm; (3) that

9   the balance of equities tips in its favor; or (4) that an injunction is in the public interest, *id.* at 19-

10   20, or that it meets the "serious questions" version of the four-factor analysis that is permitted in

11   *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

12   ## I.        PLAINTIFF CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS.

13        To prevail on a claim under the Lanham Act, Plaintiff must establish that it has valid,

14   protectable rights *and* that Restoration Hardware's offer for sale of its accused chairs is likely to

15   cause confusion.  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th

16   Cir. 1999).  Plaintiff can establish neither.  Because Restoration Hardware raises substantial

17   questions as to infringement and the validity of the rights on which Plaintiff relies, the Court

18   should deny the motion for preliminary injunctive relief.  In the patent context, if a defendant

19   raises a "substantial question" as to infringement or validity that the patentee cannot prove "lacks

20   substantial merit," the patentee is not entitled to a preliminary injunction.  *Aria Diagnostics, Inc.*

21   *v. Sequenom, Inc.*, Case No. C 11-06391 SI, 2012 U.S. Dist. LEXIS 93124, at *31-35 (N.D. Cal.

22   July 5, 2012) (denying motion for preliminary injunction); *Elantech Devices Corp. v. Synaptics,*

23   *Inc.*, Case No. C 06-1839 PVT, 2008 U.S. Dist. LEXIS 116997, at *6 (N.D. Cal. Aug. 27, 2008)

24   ("If the other party raises substantial questions concerning either infringement or validity, the

25   preliminary injunction should not issue.").  This is because a "substantial question" shows

26   insufficient likelihood of success "[g]iven the time constraints within which an accused infringer"

27   must respond to a motion for preliminary injunction.  *New Eng. Braiding Co. v. A.W. Chesterton*

28   *Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992).  The same logic applies here, and Plaintiff's motion

1    should be denied because Restoration Hardware raises substantial questions as to both the validity

2    and infringement of Plaintiff's asserted rights.  *See e.g.*, *Cazet v. Epps*, Case No. C 10-02460

3    JSW, 2010 U.S. Dist. LEXIS 67924, at *4 (N.D. Cal. June 11, 2010) (denying temporary

4    restraining order as "Court [could not] find . . . that Plaintiffs have obtained a protectable mark").

5                    **A.    Plaintiff's Asserted Rights Are Not Protectable.**

6        Trademarks are generally classified in one of four categories in a continuum from weakest

7    to strongest: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *Filipino*

8    *Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146-47 (9th Cir. 1999)

9    (citations omitted).  Generic terms are never protectable as trademarks.  *Id.* at 1147.  Descriptive

10   terms are protectable only upon a showing of secondary meaning, which refers to a "mental

11   recognition in buyers' and potential buyers' minds that products connected with the [mark]

12   emanate from or are associated with the same source."  *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,

13   654 F.3d 958, 967 (9th Cir. 2011) (citation omitted).

14       Plaintiff touts its "incontestable" registrations as a basis to demonstrate its alleged rights,

15   but "the label of 'incontestability' is rather misdescriptive."  *KP Permanent Make-Up, Inc. v.*

16   *Lasting Impression I, Inc.*, 408 F.3d 596, 603 (9th Cir. 2005).  Significantly, "incontestability"

17   does not prevent a challenge that the mark is generic.  *Gen. Conference Corp. of Seventh-Day*

18   *Adventists v. Seventh-Day Adventists Congregational Church*, 887 F.2d 228, 231 (9th Cir. 1989)

19   ("A trademark, even if it has become incontestable, is subject to the defense that the mark is

20   generic.")

21       "Incontestable" product configuration designs also "may be cancelled if the mark is

22   generic."  *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1323 (Fed. Cir. 1999)

23   (vacating dismissal of petition to cancel and remanding for determination of whether "metallic

24   nautical rope design" mark was generic).  They can also be cancelled if the trade dress is

25   functional.  15 U.S.C. § 1115(b)(8) (incontestable trade dress registration subject to "defense[] or

26   defect[]" that "the mark is functional").  Each of Plaintiff's "incontestable" registrations is subject

27

28

to cancellation.[2]

### 1. Plaintiff's THE NAVY CHAIR mark and chair trade dress are generic.

#### a. Plaintiff's THE NAVY CHAIR mark is generic.

This Circuit determines whether a term is generic by referring to the "who-are-you/what-are-you" test. *Advertise.com, Inc. v. AOL Adver., Inc.*, 616 F.3d 974, 978 (9th Cir. 2010) (vacating preliminary injunction as ADVERTISING.COM trademark was generic).  A valid trademark "answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?'  But the generic name of the product answers the question 'What are you?'" *Id.*  An online advertising company may respond to the question "what are you" with "an advertising dot-com," thus ADVERTISING.COM is generic.  *Id.; see also Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198-99 (9th Cir. 2007) ("disinfectable" answers "what-are-you" test and is generic because it "relates to the type of product rather than its source"); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1194-95 (C.D. Cal. 2007) ("kettle chips" is generic as it identifies "a type of potato chip").

Plaintiff asserts rights in a "Navy chair" trademark based on registrations for THE NAVY CHAIR and 111 NAVY CHAIR, but "Navy chair" is generic because it answers the question "what are you?," not the question "who are you?"  THE NAVY CHAIR is also generic because the addition of the term "the" cannot render a generic term protectable. *GMT Prods., L.P. v. Cablevision of New York City, Inc.*, 816 F. Supp. 207, 211 (S.D.N.Y. 1993) (finding THE ARABIC CHANNEL generic and noting, "use of the word 'the' before an unprotectable mark does not convert an otherwise generic term into a descriptive one").[3]  Plaintiff's chair was

---

[2] Restoration Hardware will file counterclaims seeking to cancel each of Plaintiff's asserted registrations.  The Court has the power to cancel invalid registrations.  15 U.S.C. § 1119.

[3] Plaintiff's claim of rights in "Navy Chair" based on 111 NAVY CHAIR also fails as a plaintiff cannot base a claim on a generic component of a mark any more than it can on a generic mark. *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 18, 38 (1st Cir. 2008) (reversing grant of preliminary injunction where no likelihood of confusion between BOSTON DUCK TOURS and SUPER DUCK TOURS, as "duck tours" was generic and BOSTON and SUPER dissimilar) (citing *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986) ("A trademark holder cannot appropriate generic or descriptive terms for its exclusive use . . . . This principle applies equally to the generic component of a trademark."))

developed by the U.S. Navy in the 1940s, and it has been used on Navy ships ever since. (Sabri Decl. Ex. 2; Mot. at 3.) Plaintiff's chair is "a Navy chair," and Plaintiff is just one source for it. Turnbull Enterprises, Inc. is another. (Sabri Decl. Ex. 6.) The existence of a 1006 Navy chair, which Plaintiff calls the "Ten-o-six," and a 111 Navy chair demonstrates this further: 111 and 1006 provide the name of the product, and, along with the name Emeco answer "who are you?" while "Navy chair" answers "what are you?" (*Id.* Ex. 17.)

In fact, the Trademark Office initially rejected Plaintiff's application to register THE NAVY CHAIR as "merely descriptive," finding that "Navy chair" "refers to a particular style of chair commonly used by the Navy." [4] (*Id.* Ex. 22.) The Trademark Office attached to its rejection pages from the Navy Shipboard Furniture Catalog showing the "Turnbull Enterprises" Navy chairs discussed above. (*Id.*) Plaintiff overcame this objection by claiming that "navy chair" had acquired secondary meaning due to Plaintiff's alleged "substantially exclusive" use of the mark since January 1999. (*Id.* Ex. 23.) Plaintiff did not reconcile its claim of "substantially exclusive use" of the mark with the evidence showing a third-party manufacturer of "navy chairs," and the Trademark Office allowed the registration based upon Plaintiff's representation. (*Id.*)

In fact, there is a plethora of similarly designed "Navy chairs" or "sailor chairs":

- A seller of midcentury antiques offers a "Vintage Goodform Aluminum Army/Navy Chair," circa 1940s, similar to Plaintiff's chair. (*Id.* Ex. 4.)

- Similar "Sailor Chairs" are available on Amazon.com and NYCBed.com. (*Id.* Exs. 14-15.)

- A similar "Brushed Aluminum Navy Side Dining Chair" was available on Amazon.com. (*Id.* Ex. 8.)

- Seating Depot.com sells a "stackable navy chair." (*Id.* Ex. 13.)

- A comparably styled "[b]rushed aluminum dining Navy chair" was recently available on eBay. (*Id.* Ex. 10.)

---

[4] The Trademark Office also initially rejected Plaintiff's application to register 111 NAVY CHAIR, stating "'Navy chair' refers to a particular style of chair." (Sabri Decl. Ex. 24.) Plaintiff overcame the objection by relying solely on its existing registration for THE NAVY CHAIR as evidence that NAVY CHAIR had acquired secondary meaning. (*Id.*)

- "Argent Navy Chair in Aluminum" and "Classic Design Navy Chair Aluminum Dining Chair Reproduction" were recently available on eBay. (*Id.* Exs. 9, 12.)

Each of the examples pictured below is an aluminum "navy chair" or "sailor chair" sold by an entity *other than Plaintiff*.

    

(*Id.* Exs. 4, 10, 13-15.)

Restoration Hardware has raised a substantial question of genericness as to THE NAVY CHAIR mark, such that a motion for preliminary injunction based on that mark must be denied.

**b.    Plaintiff's trade dress is generic.**

Trade dress has a different test to determine genericness: "(1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 465 F. Supp. 2d 956, 962 (N.D. Cal. 2006).  Plaintiff's asserted trade dress[5]—shown below—is generic under the second and third formulations set forth in *Walker*.  It is merely the basic form of a type of a chair with four legs, a back, and a seat, and the specific presentation of these elements is similarly so basic and unadorned, that the design cannot be considered distinctive.



---

[5] Plaintiff never clearly explains the basis for its claim of trade dress rights.  To the extent that Plaintiff relies on U.S. Reg. No. 3,191,187, that registration is for a logo, not for a chair design.  (Mot. at 5; Blavin Decl. ¶ 8, Ex. 7.)  Plaintiff cites no authority, because there is none, to support its position that a logo incorporating a common object can serve as a basis for a product configuration trade dress infringement claim.

1

2  (Compl. Ex. 1.)  Plaintiff's director of product development *admits* that Plaintiff "basically took a

3  generic wood chair, took the design over and made it in aluminum," and that if one were to ask a

4  child to draw a chair, "she will probably take the 1006 chair, because it's just a classic chair."

5  (Sabri Decl. Ex. 1.)  A lineup of Plaintiff's chair, the accused chair, a third-party "sailor chair"

6  available on Amazon.com, and two so-called "alternative designs" (Mot. at 14-15) demonstrates

7  how commonplace this basic form is:

8

9

10  

11

12

13  (Sabri Decl. Ex. 25.)

14       A Restoration Hardware employee even came across a Chinese-made Navy chair in a

15  local mall just this week.  (Edelman Decl. ¶ 11.)  The fact that numerous competitors are selling

16  very similar "naval chairs" and "sailor chairs" is strong evidence that the chair design[6] is generic.

17  (*See supra* pp. 9-10; Sabri Decl. Exs. 11 (ITALMODERN Cafe Aluminum Side Chair), 16

18  (DecoDina "military style" chairs in restaurant)); *Stuart Spector Designs, Ltd. v. Fender Musical*

19  *Instruments Corp.*, 94 U.S.P.Q.2d 1549, 1555 (T.T.A.B. 2009) (explaining that "competitor use

20  of the same or substantially similar designs is evidence of genericness").  A generic,

21  unprotectable design cannot serve as a basis for a preliminary injunction.

22                          **c.       Plaintiff's trade dress is functional.**

23       "The functionality doctrine prevents trademark law . . . from . . . inhibiting legitimate

24  ───────────────────────

25       [6] U.S. Reg. No. 3,191,187 for the chair logo is also generic and incapable of identifying a
   source.  An image logo that is generic is unprotectable.  *Kendall-Jackson Winery, Ltd. v. E. & J.*

26  *Gallo Winery*, 150 F.3d 1042, 1048 (9th Cir. 1998) (holding that "[g]rape-leaf designs have
   become generic emblems for wine" and are not protectable);  *In re Capri Macaroni Corp.*, 173

27  U.S.P.Q. 630, 631-32 (T.T.A.B. 1972) (affirming refusal to register picture of colored macaroni
   because so-called mark was "nothing more than the goods itself").

28

1  competition by allowing a producer to control a useful product feature." *Qualitex Co. v.*

2  *Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995).  Indeed, "copying is not always discouraged or

3  disfavored by the laws which preserve our competitive economy;" it "will have salutary effects in

4  many instances." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).  For these

5  reasons, the Supreme Court warned that "trade dress protection must subsist with the recognition

6  that in many instances there is no prohibition against copying goods and products." *Id.*  Courts

7  are thus circumspect "when extending protection to product designs because such claims present

8  an acute risk of stifling competition." *Walker*, 465 F. Supp. 2d at 961 (internal quotation marks

9  and citation omitted) ("granting trade dress protection to an ordinary product design create[s] a

10  monopoly in the goods themselves").

11       The Ninth Circuit looks to four factors in determining functionality: "(1) whether the

12  design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether

13  advertising touts the utilitarian advantages of the design, and (4) whether the particular design

14  results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n v.*

15  *Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).  Under this test, Plaintiff's asserted

16  chair design trade dress (*see supra* p. 10) is functional and its registration is subject to

17  cancellation.

18       First, by Plaintiff's own admission the trade dress clearly yields a utilitarian advantage—

19  the chair is a "utilitarian, purpose-built chair," designed to be "a seaworthy, lightweight and

20  durable chair suitable for use on warships and submarines."  (Sabri Decl., Ex. 2; Buchbinder

21  Decl. ¶ 4.)  In fact, each of the specific elements that Plaintiff asserts as comprising its trade dress

22  provides a utilitarian advantage to Plaintiff's Navy Chair: (i) three vertical bars connect the upper

23  and lower curves of the back of the seat and offer a place to grip the chair when moving it, (ii) the

24  rounded bends at top corners on the upper back of the seat, which also form the back legs, the

25  rounded curve on the lower back of the seat, and the overall concave curvature of the chair back

26  offer back support and comfort and the roundness avoids sharp corners, (iii) the seat with its "butt

27  dip" provides a comfortable place for one's posterior, (iv) the horizontal bars between the chair

28  legs offer structural support, (v) the "outward bend" of the back legs provides stability, and

(vi) the lack of fasteners (yielding a sculpture-like, one-piece design) improves the quality of the chair by eliminating moving parts that could break.[7]  In fact, Plaintiff touts durability as a key characteristic of its chair, and the lack of fasteners furthers this stated goal of making a chair that lasts.  (Sabri Decl. Ex. 28.)  Plaintiff also refers to "the pie-shaped cross section of the tapered front legs," but that element is not featured in Plaintiff's asserted trade dress registration and thus is not at issue here.  *See* note 7 *supra*.  Moreover, this element is functional, as the use of rounded edges on the front chair legs makes for a smooth transition from the rounded seat corner, thereby avoiding sharp edges and preventing injury and clothes-snagging.

One design blog highlighted the inherently functional nature of Plaintiff's trade dress, lauding how the chair consists of "a seamless, aluminum frame that is formed perfectly for ergonomics and doesn't fuss with ornamentation."  (Sabri Decl. Ex. 26.)  Taken together as a whole, Plaintiff's trade dress is merely an arrangement of elements necessary to the product's purpose as a durable, industrial chair that fit the U.S. Navy's specifications.  The specific design enhances its durability and thus undeniably yields a utilitarian advantage.  In another recent case involving a far more unique design of a chair enveloped within a tree trunk, the court concluded that the asserted chair design was functional because the elements of the asserted trade dress were "essential to the use or purpose of the furniture piece or affect[ed] the cost or quality of the furniture piece."  *See e.g., Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, Case No. 11 Civ. 01794 (LTS)(AJP), 2011 U.S. Dist. LEXIS 147102, at *20-21 (S.D.N.Y. Dec. 22, 2011) (internal citations omitted).

Second, Plaintiff points to two "alternative designs for aluminum-based chairs that did not copy, *identically*, the complete design of the Navy Chair®" to suggest that alternative designs are available (Mot. at 14-15 (emphasis added)), but the differences are minor.  The numerous sources

---

[7] Plaintiff identifies a "distinct hand brushed finish with the contrasting direction where the leg meets the seat bottom" as an element of its trade dress (Mot. at 13), but its trade dress registration is a line drawing that does not cover specific finishes.  (Blavin Decl. ¶ 7, Ex. 6.)  Similarly, Plaintiff cannot rely on "the positioning and angle of the curved horizontal bar(s) on the lower base of the seat" (Mot. at 13) because they are not shown on the drawing.  For purposes of this motion, the elements of Plaintiff's trade dress are limited to the design disclosed in U.S. Reg. No. 2,511,360 because Emeco failed to assert common law trade dress rights in its motion.

1   of aluminum chairs that are virtually identical to Plaintiff's chair design demonstrate that the

2   elements of Plaintiff's claimed trade dress are essential to the purpose and use of a lightweight

3   aluminum chair.  *TrafFix*, 532 U.S. at 28-29.

4       Third, Plaintiff's advertisements tout the durability of its chairs with headlines that

5   proclaim: "First let's make things that last."  (Buchbinder Decl. Ex. A; Sabri Decl. Exs. 27-29.)

6   Plaintiff achieved this utilitarian durability using a functional chair with no fasteners, no moving

7   parts, and made of a single strong material—aluminum.  Plaintiff's touting of this facet of the

8   design is evidence that the design is functional.

9       Fourth, the chair "design results from a comparatively simple or inexpensive method of

10  manufacture."  *Disc Golf*, 158 F.3d at 1006.  Numerous third parties sell comparable chairs in the

11  range of $89 to $255 (Sabri Decl. Exs. 8-15), and dozens of manufacturers offer comparable

12  chairs wholesale in the range of $19 to $100.  (*Id.* Ex. 31.)  The particular chair design selected by

13  Restoration Hardware has a wholesale price of $37.  (Hamman Decl. Ex.1.)  While Plaintiff may

14  use a complex 1940s manufacturing process (Mot. at 16), that decision does not render the design

15  itself complex or costly.  As shown by the prices above, the chair *design* is inexpensive to build.

16      For these reasons, there is at least a substantial question as to whether Plaintiff's trade

17  dress is functional.

18              **B.      Plaintiff Has Not Shown a Likelihood of Confusion.**

19      Courts look to the multifactor test set out in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341,

20  348-49 (9th Cir. 1979), to assess likelihood of confusion.  Specifically, these factors are:  (1)

21  strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of

22  actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to

23  be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of

24  expansion of the product lines.  *Id.*  It is not sufficient to show that confusion is possible.  Plaintiff

25  instead must demonstrate that Restoration Hardware's chairs are "likely to confuse an

26  *appreciable* number of people."  *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1151 (9th Cir.

27  2002) (emphasis in original).  In other words, they "will *probably* cause consumer confusion as to

28  the source or sponsorship of the product."  *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC,*

1   741 F. Supp. 2d 1165, 1177 (C.D. Cal. 2010) (emphasis added).

2          Plaintiff asserts that the *Sleekcraft* test is "unnecessary" here because Restoration

3   Hardware's products are counterfeits.  (Mot. at 19 & nn.7-8.)  Unlike in the cases cited by

4   Plaintiff, Restoration Hardware has not engaged in "counterfeiting."  In *Ubiquiti Networks, Inc. v.*

5   *Kozumi USA Corp.*, Case No. C 12-2582 CW, 2012 U.S. Dist. LEXIS 85665, at *38-39 (N.D.

6   Cal. June 20, 2012), the court noted that defendants' counterfeit products "used design, hardware

7   and software identical to the original Ubiquiti product" and "[n]otably" used plaintiff's registered

8   word mark as well as the company's name and corporate address.[8]  By contrast, Restoration

9   Hardware has not used the Emeco name; it used the term "naval" in its descriptive sense; it

10  marketed the chairs in its own catalog and on its own website; and it did not try to sell them as

11  Emeco chairs.  *Cf. Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, Case No. C 04-

12  4146 MMC, 2007 U.S. Dist. LEXIS 7880, at *7 (N.D. Cal. Feb. 2, 2007) (emphasis added)

13  (Chesney, J.) ("mark and design imprinted" on counterfeit products was "the same as, or

14  substantially indistinguishable, from" from plaintiff's mark and trade dress).

15          **1.    Key *Sleekcraft* factors establish that confusion between**
              **Plaintiff's trade dress and trademarks and Restoration**
16            **Hardware's chairs is not likely.**

17                  **a.    Plaintiff's trade dress and trademarks are very weak.**

18          Even if the Court determined that Plaintiff's trade dress and trademarks are not generic,

19  they would still be very weak and should be afforded very little protection.  *See Entrepreneur*

20  *Media*, 279 F.3d at 1142 n.3 (registration's incontestable status "does *not* require a finding that

21  the [trade dress] is strong").  Although the Restoration Hardware chairs look similar to Plaintiff's

22  chairs, as discussed above, Plaintiff's chair design is a basic design common throughout the

23  

24          [8] *See also Herman Miller Inc. v. Alphaville Design Inc.*, Case No. C 08-03437 WHA,
       2009 U.S. Dist. LEXIS 103384, at *3 (N.D. Cal. Oct. 22, 2009) (counterfeit chairs were
25     "identical with, or substantially indistinguishable from" registered trade dress and were advertised
       under plaintiff's brand name); *Philip Morris USA Inc. v. Felizardo*, Case No. 03 Civ. 5891 (HB),
26     2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) (counterfeit cigarettes were sold
       in "imitation" Phillip Morris cartons); *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067,
27     1071, 1073 (C.D. Cal. 2004) (stating that goods were counterfeit where they "appeared to be"
       MARLBORO® and MARLBORO LIGHTS® brand cigarettes).

28

1    furniture industry, and "Navy chair" is a common phrase used by competitors to describe a style

2    of chair.  (*See, e.g.*, Sabri Decl. Ex. 4, 8-10, 12-13.)  The numerous third-party uses of similar

3    chair designs and names significantly weaken Plaintiff's trade dress and trademark.

4            A trade dress or trademark is weak where there is little or no association between it and

5    the origin or source.  *See Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137,

6    1149 (9th Cir. 2011).  Plaintiff offers circumstantial evidence of the strength of its trade dress and

7    trademark in the form of investment in advertising and length of use.  (Mot. at 17-18.)   However,

8    this is not sufficient to convert weak trade dress and trademark rights into strong ones because it

9    says nothing of the "effectiveness" of Plaintiff's efforts.  *See First Brands Corp. v. Fred Meyer,

10   Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987).  Plaintiff presents no evidence that consumers actually

11   associate its trade dress solely with Plaintiff.  Plaintiff's failure to submit survey evidence on this

12   point is particularly telling.  *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir.

13   1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary

14   meaning.").  In fact, Restoration Hardware submits a survey that shows that only 1.0% (2.5% at

15   most) of people surveyed associated Restoration Hardware's chair—which Plaintiff alleges is

16   virtually indistinguishable from its own trade dress—with Plaintiff.  (Poret Decl. ¶¶ 6, 9 Ex. 1 at

17   11, 19, 21.)  These rates fall far below the figures generally found to support a finding of

18   secondary meaning.  *See Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137

19   (D. Mass. 2003) (no reasonable jury could infer secondary meaning from 0-2.73% association).

20                    **b.       There is no evidence of significant actual confusion.**

21           Plaintiff's failure to offer survey evidence on likelihood of confusion "may lead to an

22   inference that [Plaintiff] predicted that the results of such a survey would be unfavorable," *Cairns

23   v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041-42 (C.D. Cal. 1998), which turned out to be true

24   as Restoration Hardware's survey firmly demonstrates that confusion is *not* likely.  When shown

25   the chair alone, only 1% or 1.5% of those surveyed associated the look of that chair with Emeco.

26   (*Id.* ¶¶ 6, 9 Ex. 1 at 11, 19, 21.)  When shown the relevant pages of Restoration Hardware's

27   catalog with the accused phrase "Introducing 1940s Naval Chair," only 1% or 1.5% believed the

28   chair was made by, affiliated with, or authorized by Emeco.  (*Id.* at ¶¶ 6, 9, Ex. 1 at 11, 19, 21.)

1  Restoration Hardware's survey expert concludes that "there is no more than a negligible

2  likelihood that the Restoration Hardware chair will be confused with Emeco or its Navy Chair . . .

3  [or] that the appearance of the chair in the Restoration catalog will cause an association with

4  Emeco's Navy Chair."  (*Id.* ¶ 10.)

5      This is strong evidence that there is no likelihood of confusion between the chair as

6  pictured and described in Restoration Hardware's catalog and Plaintiff's trade dress and

7  trademarks.  *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 629, 633 (9th Cir. 2005)

8  (survey showing less than 2% confusion demonstrated "absence of significant confusion");

9  *Cairns*, 24 F. Supp. 2d at 1040 ("Survey evidence clearly favors the defendant when it

10  demonstrates a level of confusion much below ten percent.") (internal citation and quotation

11  marks omitted); *see also Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir.

12  1983) (affirming conclusion that "a 7.6% confusion finding weighs against infringement").

13      Instead of a survey, Plaintiff offers "evidence" of "several instances" of actual confusion

14  (Mot. at 20; Blavin Decl. ¶ 15, Ex. 14), but the weight of the evidence shows that consumers are

15  *not* confused and are aware that there are different sources for the chairs.  (*See* Blavin Decl. ¶ 16,

16  Ex. 15 (user comment noting that "Restoration Hardware has some relatively reasonable repros of

17  the Emeco classic"); *id.* ¶ 17, Ex. 16 (describing Restoration Hardware's chair as "Emeco-

18  esque").  If a consumer refers to a chair as a "repro," she does not think it is the original product.

19  Similarly, the "Emeco-esque" comment does not imply that there is any confusion as to source,

20  sponsorship, or affiliation.  *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1083 (9th Cir.

21  2005) (emphasis in original) (finding evidence that "[a]t best" showed consumer was "*reminded*"

22  of plaintiff did not show actual confusion).  A review of the other blog commenters that Plaintiff

23  submitted does not suggest a likelihood of confusion.  (*See* Blavin Exs. 14-16.)

24                    **c.    The parties use different trade channels.**

25      Plaintiff and Restoration Hardware market their products through distinct trade channels

26  such that consumer confusion is highly unlikely.  Plaintiff sells its products through its website,

27  "established retail furniture and design stores such as Design Within Reach," and "to trade

28  architects and designers, governments, contract dealers, international distributors, and for end use

1    commercial applications." (Mot. at 5.)  Restoration Hardware, by contrast, sells its products

2    through its own retail stores, website, and catalogs.  (Hamman Decl. ¶ 1.)  Because Plaintiff does

3    not sell its chairs through Restoration Hardware's retail channels, the parties do not use

4    overlapping marketing channels, eliminating any risk of point-of-sale consumer confusion.  *See*

5    *Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1361 (9th Cir. 1993) (finding that "almost no

6    overlap[] of marketing channels" weighed in favor of no confusion).

7                      **d.       Consumers exercise a high degree of care.**

8              When purchasing expensive items, consumers are considered "to be more discerning—

9    and less easily confused . . . ."  *Brookfield Commc'ns, Inc.*, 174 F.3d at 1060.  Here, Plaintiff sells

10   its chairs for approximately $455 (Blavin Decl. Ex. 1), whereas Restoration Hardware listed the

11   price of its chairs at $129 (*id.* Ex. 11).  Given these price points, consumers will use care before

12   making a decision to purchase and will understand that there may be a difference between these

13   two products.  *See Beats Elecs., LLC v. Fanny Wang Headphone Co.*, Case No. C-10-5680

14   MMC, 2011 U.S. Dist. LEXIS 2228, at *16 (N.D. Cal. Jan. 5, 2011) (denying TRO in part

15   because "given the relatively high price point," a typical consumer is "likely to exhibit care when

16   making his/her selection").

17                      **e.       Restoration Hardware did not intend to cause confusion
                                with Plaintiff's chairs.**
18

19             Plaintiff offers no evidence that Restoration Hardware intended to confuse consumers as

20   to the source of its products.  Plaintiff argues that Restoration Hardware sells counterfeit goods

21   and that that shows intent.  (Mot. at 21.)  However, Plaintiff's case for counterfeiting relies not on

22   evidence, but rather on *ad hominem* attacks that Restoration Hardware is sued a lot and steals the

23   designs of others.  Such allegations do not show Restoration Hardware's intent to confuse its

24   customers into believing it was selling Emeco chairs.

25                      **f.       The word marks are not sufficiently similar to cause
                                confusion**
26

27             Restoration Hardware's descriptive phrases such as "Introducing 1940s Naval Chair" and

28   "Introducing 1940s Aluminum Naval Chair Collection" are not similar enough to the trademarks

THE NAVY CHAIR or 111 NAVY CHAIR to cause confusion.[9]  The only true overlap is the

generic word CHAIR.  The term "naval" is a common descriptive word for something designed

and used by the U.S. Navy.  Using the descriptive word "naval" does not create a likelihood of

confusion.  *See Entrepreneur Media*, 279 F.3d at 1145 n.9.  The fact that the accused phrases

appeared only on Restoration Hardware's website and in Restoration Hardware's catalog, and not

on any products, also militates against a finding that the marks are sufficiently similar to cause

confusion.  Consumers who encounter the accused phrases will only see them in connection with

Restoration Hardware, which they will understand to identify the source of the products.  *See*

*Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1073-74 (N.D. Cal. 2012) (GROUPION

and GROUPON dissimilar because of differences in color, background, and capitalization, as

well as frequent appearance of distinct tagline next to GROUPION).

### 2.      Defendants' accused phrases are protected by the defense of fair use.

Even if there were some likelihood of confusion due to Restoration Hardware's use of the

accused phrases, the affirmative defense of "fair use" defeats trademark claims where, as here, a

defendant uses a term "descriptively, not as a mark, fairly, and in good faith."  *KP Permanent*

*Make-Up, Inc.*, 543 U.S. at 123-24 (defendant "has no independent burden to negate the

likelihood of any confusion;" "fair use can occur along with some degree of confusion") (citing

15 U.S.C. § 1115(b)(4)).  The Supreme Court cautioned that a trademark owner adopting a mark

with a descriptive meaning, as here, accepts a risk of confusion, and "the use of a similar name by

another to truthfully describe his own product does not constitute a legal or moral wrong."  *Id.* at

119, 122 (internal citations omitted).  Thus, where a party used "VCR-2" to describe a particular

input on a receiver, it was not liable for infringing the registered "VCR-2" mark, as its use was

---

[9] Plaintiff's conclusory assertion that Plaintiff counterfeited the word marks 111 NAVY CHAIR and THE NAVY CHAIR marks is baseless.  (Mot. at 19.)  The Lanham Act defines a "counterfeit mark" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.  The identicality standard for counterfeiting is high.  *Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC, 507 F.3d 252, 269 (4th Cir. 2007).  Plaintiff's use of "Introducing 1940s Naval Chair" does not even begin to meet this standard.

1   "fair use as a matter of law."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d

2   1460, 1467 (9th Cir. 1993).

3       Plaintiff attacks Restoration Hardware's use of the phrases "Introducing 1940s Naval

4   Chair" and "Introducing 1940S Aluminum Naval Chair" as shown below:

5
6
7     
8
9
10
11
12
13

14   (Blavin Decl. Exs. 11, 13.)  However, these accused phrases are protected by the fair use defense

15   because they are fair, good faith descriptive uses, and they are not being used as trademarks.  *KP*

16   *Permanent Make-Up*, 543 U.S. at 124.  The Navy chair was designed by the U.S. Navy in the

17   1940s (*supra* p. 2), has been used by the Navy on ships and submarines for decades, and

18   continues to be used by the Navy to this day.  (Compl. ¶ 13.)  Restoration Hardware's phrases

19   thus aptly describe the chairs.  Plaintiff even concedes that Restoration Hardware uses the phrase

20   "naval chair" in "*describing* its products."  (Mot. at 6, 11) (emphasis added).  Notably, Plaintiff is

21   not accused of using a term identical to Defendants' purported "navy chair" trademark, and uses

22   the phrase "naval chair" only as part of a longer phrase.  Indeed, Restoration Hardware's survey

23   results, which presented respondents with the chairs as they appeared in the Restoration Hardware

24   catalog, along with the phrase "Introducing 1940s Naval Chair," demonstrate that the phrase was

25   not viewed as a trademark or source identifier.

26       Plaintiff has not shown a likelihood of confusion resulting from Restoration Hardware's

27   use of the descriptive term "naval chair" in connection with longer phrases.

28

## II.   PLAINTIFF CANNOT DEMONSTRATE THAT IT IS LIKELY TO SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

Plaintiff must demonstrate that it is likely to suffer irreparable harm in the absence of an injunction. *Rovio Ent'mt Ltd. v. Royal Plush Toys, Inc.*, Case No. C 12-5543 SBA, 2012 U.S. Dist. LEXIS 159257, at *14-15 (N.D. Cal. Nov. 6, 2012). Previously, courts presumed irreparable injury if the moving party showed likelihood of success on the merits of trademark infringement claims. *Id.* at *12 (citing *Brookfield Communs., Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1099)). However, in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006), the Supreme Court rejected categorical rules that avoid the four-factor injunction test, and in *Winter v. NRDC, Inc.,* 555 U.S. 7, 22 (2008), emphasized that preliminary injunctions are "extraordinary remed[ies]" that may only be awarded where "irreparable injury is *likely* in the absence of an injunction." (emphasis in original).

The Ninth Circuit has not directly addressed whether a presumption of irreparable harm upon a showing of likelihood of success still exists in trademark infringement suits, but numerous judges in this district have found that a plaintiff is *not* entitled to a presumption of irreparable harm. *See, e.g.*, *Rovio Ent'mt Ltd.*, 2012 U.S. Dist. LEXIS 159257, at *14-15 (holding no presumption and denying request for TRO); *BoomerangIt, Inc. v. ID Armor, Inc.*, Case No. 5:12-cv-0920 EJD, 2012 U.S. Dist. LEXIS 86382, at *9-10 (N.D. Cal. June 21, 2012) (same); *ConocoPhillips Co. v. Gonzalez*, Case No. 5:12-cv-00576-LHK, 2012 U.S. Dist. LEXIS 20972, at *5-6 (N.D. Cal. Feb. 17, 2012) (same, denying motion for TRO and preliminary injunction); *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1167 (N.D. Cal. 2011) (same, denying motion for preliminary injunction). One court in this circuit denied a preliminary injunction on a Lanham Act false advertising claim where the plaintiff failed to establish likelihood of irreparable harm even though *all other factors* favored the plaintiff. *Leatherman Tool Group, Inc. v. Coast Cutlery Co.*, 823 F. Supp. 2d 1150, 1158-59 (D. Or. 2011) ("[T]hree of the four factors—likelihood of success on the merits, balance of the equities, and the public interest—favor Leatherman. I cannot however, grant Leatherman's request for a preliminary injunction because it has failed to show a likelihood of irreparable harm."). In analyzing irreparable harm, the Ninth

1 Circuit has emphasized that "the correct standard is not whether there is a 'possibility' but

2 whether there is a 'likelihood of irreparable injury.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109,

3 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 26.); *see also Caribbean Marine Servs. Co. v.*

4 *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable

5 injury sufficient to warrant granting a preliminary injunction.").

6       Plaintiff does not carry its burden of showing a *likelihood* of irreparable harm as it makes

7 only conclusory assertions of irreparable harm and provides no persuasive evidence.  Plaintiff

8 argues that it will lose reputation and goodwill because the products Restoration Hardware

9 offered were inferior and cheaper.   (Mot. at 21-22.)  It provides no evidentiary support, relying

10 solely on a self-serving and equally conclusory declaration from Plaintiff's CEO.  (*Id.*)  Plaintiff

11 provides no evidence of lost sales, price erosion,[10] loss of market share, or even damage to

12 goodwill or reputation, only the speculative and subjective belief that it will be harmed.  The

13 *Leatherman* court found that a declaration from "one of [plaintiff's] senior executives to vouch

14 for [plaintiff's harm]" was insufficient to establish likelihood of irreparable harm, as "plaintiff

15 must offer something more than a mere subjective belief that it is likely to be injured."

16 *Leatherman Tool Group*, 823 F. Supp. 2d at 1158 (internal citation omitted).  Similarly, the fact

17 that the infringing product was cheaper and plaintiff's market position would be harmed did not

18 show irreparable harm.  *OG Int'l, Ltd. v. Ubisoft Entm't*, Case No. C 11-04980 CRB, 2011 U.S.

19 Dist. LEXIS 124020, at *27 (N.D. Cal. Oct. 26, 2011) (denying motion for preliminary

20 injunction).[11]  Plaintiff has not presented any real evidence of irreparable harm, only speculative

21

22       [10] Plaintiff's assertion that Restoration Hardware's "low price point" "cheapens the entire Navy Chair product line" is at odds with the facts.  The market is already saturated with "navy chairs" priced below and above the Restoration Hardware chairs.  (Sabri Decl. Exs. 8, 9, 13, 14.)

23

24       [11] Plaintiff cites four cases to support its claim that loss of goodwill establishes irreparable harm, but each of the cases had ample evidence of irreparable harm and the courts did not rely solely on assertions of loss of goodwill.  (*See* Mot. at 21-22.)  *Stuhlbarg Int'l Sales Co., Inc. v.*

25 *Brush and Co., Inc.*, 240 F.3d 832, 840-41 (9th Cir. 2001), had evidence of threatened loss of specific customers.  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083

26 (N.D. Cal. 2012), had evidence of wider actual confusion.  *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008), had evidence of a risk of loss of a $29 million contract

27 and a small community at risk of confusion.  *Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*, Case No. 07-2015, 2007 U.S. Dist. LEXIS 11435, at *24-27 (W.D. Ark. Feb. 16, 2007), had

28                                                             (Footnote continues on next page.)

1   assertions of harm that are insufficient to satisfy Plaintiff's burden.

2        Moreover, Plaintiff's entire claim of irreparable harm is premised on an assumption of

3   future sales of the accused chairs.  Restoration Hardware, however, has not sold a single chair,

4   and has told Plaintiff and this Court that it will not do so until the Court rules in this case.

5   Restoration Hardware promptly removed the word NAVAL from its website after it received a

6   cease-and-desist letter from Plaintiff's counsel, and even locked down its inventory.  (Edelman

7   Decl. ¶ 2.)  It cancelled all outstanding orders for the chairs and informed customers who had

8   placed phone or internet orders that their chair orders would not be filled.  (*Id.* ¶¶ 4, 6.)

9   Restoration Hardware also removed the SKUs of the accused chairs from its purchasing system

10  so the accused chairs *cannot* be sold.  (*Id.* ¶ 3.)

11       This is not a situation where a defendant simply declares that it will not infringe in the

12  future; rather, Restoration Hardware has gone above and beyond to assure Plaintiff that there is

13  no chance of alleged infringement during the pendency of the case, despite substantial questions

14  on the merits.  Defendants' actions either moot the injunction outright, or at a minimum, make the

15  risk of irreparable harm extremely slight.  *See Nichia Corp. v. Seoul Semiconductor, Ltd.*, Case

16  No. 06-0162 MMC, 2008 U.S. Dist. LEXIS 12183, at *7-8 (N.D. Cal. Feb. 7, 2008) (denying

17  permanent injunction where defendants no longer manufactured product, only two accused

18  products had been sold, and technology in question was obsolete);  *see also Hypoxico Inc. v.*

19  *Colorado Altitude Training LLC*, Case No. 02 Civ. 6191 (TPG), 2012 U.S. Dist. LEXIS 122830,

20  at *34 (S.D.N.Y. Aug. 28, 2012) ("With regard to the 150 tent, [defendant] no longer sells it, and

21  no injunction is necessary.");  *Tyco Healthcare Grp. LP v. Applied Med. Res. Corp.*, Case

22  No. 9:09-cv-176, 2011 U.S. Dist. LEXIS 154686, at *5-6 (E.D. Tex. Sept. 23, 2011) (denying

23  motion for reconsideration where district court had previously held, "[Defendant] also represents

24  that it no longer makes or sells the accused products.  To the extent that this is indeed the case,

25  _____

26  (Footnote continued from previous page.)

27  evidence of gray market sales of mattresses that did not comply with plaintiff's handling
    requirements.

28

1  Plaintiffs' argument regarding irreparable harm carries even less weight.").

2       **III.    THE BALANCE OF HARDSHIPS DOES NOT FAVOR ISSUANCE OF A**
3                    **PRELIMINARY INJUNCTION.**

4        To prevail, Plaintiff must establish that "the balance[e] of equities tips in [its] favor."

5  *Winter*, 555 U.S. at 20.  Courts "must balance the competing claims of injury and consider the

6  effect on each party of the granting or withholding of the requested relief."  *Id.* at 24 (citation

7  omitted).  Because Plaintiff has not shown that it will suffer irreparable harm if an injunction does

8  not issue, Plaintiff has not identified significant hardships that will weigh in its favor.

9        By contrast, Restoration Hardware will suffer substantial hardship if Plaintiff's proposed

10  injunction issues.  It is overbroad, unduly burdensome, and grossly unfair.  It would require that

11  Restoration Hardware provide a notice to all recipients of its catalogs that "the genuine Navy

12  Chair® products are available for purchase from Plaintiff and its authorized retailers."  (Pl.'s

13  Proposed Order ¶ 4.)  In essence, Plaintiff wants Restoration Hardware to create free advertising

14  for Plaintiff, an excessive measure that "would not be remedial, but rather would be punitive."

15  *Supelco, Inc. v. Alltech Assocs.*, Case No. 86-2484, 1986 U.S. Dist. LEXIS 21236, at *14-15

16  (E.D. Pa. Aug. 25, 1986) (denying preliminary injunction in false advertising case that would

17  require recall of advertisements that had "limited effect"); *JL Beverage Co., LLC v. Beam, Inc.*,

18  Case No. 2:11-cv-00417-MMD-CWH, 2012 U.S. Dist. LEXIS 137076, at *48-49 (D. Nev. Sept.

19  25, 2012) (identifying recall of products and promotional materials as hardships that tip balance

20  in defendants' favor).  Additionally, these proposed remedies would not remedy Plaintiff's

21  alleged harm.  If harm was caused in September by exposing potential customers to a less

22  expensive version of a naval chair in the catalog (and Restoration Hardware certainly denies that

23  there was any harm), it is hard to fathom how reminding these customers of that chair now, three

24  months later, will improve the situation.

25        In addition to the financial cost of recalling catalogs and publishing a corrective notice,

26  Restoration Hardware will suffer a loss of goodwill with its customers that would be

27  disproportionate to any asserted harm of simply leaving the status quo in place.  Such

28  overreaching corrective measures are should be avoided given that the record in this case is far

1  from fully developed.  *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F. Supp. 340, 350-51

2  (D.N.J. 1996) (finding that harm from defendant being forced to change its name would be

3  irreparable and more devastating than the possibility of harm to plaintiff's reputation).

4  **IV.   THE PUBLIC INTEREST DOES NOT REQUIRE A PRELIMINARY
       INJUNCTION**

5

6          In trademark cases, "courts often define the public interest at stake as the right of the

7  public not to be deceived or confused."  *Cytosport v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051,

8  1081 (E.D. Cal. 2009).  Because Plaintiff has failed to establish that consumer confusion is likely,

9  the public interest weighs against granting an injunction.  *See JL Bev.*, 2012 U.S. Dist. LEXIS

10  137076, at *48-49 (public interest weighs against injunction where "the public is unlikely to be

11  confused"); *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1170 (C.D. Cal. 2009) (same).

12          Though Restoration Hardware has stopped selling the products, granting an injunction

13  here would undercut the well-settled policy of "encouraging, not stifling, competition."  *Calvin*

14  *Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987).  The public

15  interest favors such competition because it offers consumers more choices.  *Id.* (vacating

16  preliminary injunction where "strong public interest in lowest possible prices" not considered).[12]

17                                          **CONCLUSION**

18          For the foregoing reasons, this Court should deny Plaintiff's motion for a preliminary

19  injunction and allow this case to proceed to a full and fair determination on the merits after there

20  has been adequate time for discovery.

21

22

23

24

25  _____

26  [12] Plaintiff argues that because Restoration Hardware has stopped selling the products, it
   "is willing and able to assume any monetary loss risk as a result of an injunction" such that no
27  bond is required.  (Mot. at 24 n.12.)  Plaintiff cites no authority and has not demonstrated why
   this Court should deviate from the plain language of Fed. R. Civ. P. 65(c), which requires a bond.

28

1    Dated: November 16, 2012              MORRISON & FOERSTER LLP

2

3                                          By:  */s/ Wesley E. Overson*
                                                WESLEY E. OVERSON
4
                                                Attorneys for Defendants
5                                               RESTORATION HARDWARE, INC.
                                                and GARY FRIEDMAN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28